MONTGOMERY WARD & CO., Incorporated, Plaintiff,

v.

The NORTHERN PACIFIC TERMINAL COMPANY OF OREGON, et al., Defendants.

Civ. A. No. 1686.

United States District Court
D. Oregon.

April 23, 1954.

Stuart S. Ball, John A. Barr, David L. Dickson, William L. Niemann, Chicago, Ill., and Stephen Parker, Portland, Or., for Montgomery Ward & Co.

Roy F. Shields, Joseph Berkshire, Portland, Or., Dean H. Eastman, Seattle, Wash., for Northern Pacific Terminal Co., of Oregon.

Charles A. Hart, Portland, Or., Clark A. Eckart, Seattle, Wash., for Great Northern Railway Co.

Charles A. Hart, Fletcher Rockwood, Portland, Or., Dean H. Eastman, Clark A. Eckart, Seattle, Wash., for Spokane, Portland & Seattle Ry. Co.

Charles A. Hart, Portland, Or., Dean H. Eastman, Seattle, Wash., for Northern Pac. Ry. Co.

Roy F. Shields, Joseph G. Berkshire, Portland, Or., for Union Pac. Ry. Co.

Clarence J. Young, Portland, Or., for Southern Pac. Co.

Borden Wood, Grant T. Anderson, Portland, Or., for Railway Express Agency.

John M. Hickson, Portland, Or., for F. D. Hartwick and others.

C. O. Fenlason, Portland, Or., for Gustav Robertson.

William P. Ellis, Portland, Or., for Albert C. Pounder and others.

Leonard D. Alley, Portland, Or., for Emil Jossy, and others.

C. E. Holbrook and Donald A. Schafer, Portland, Or., for Consolidated Freightways, Inc.

JAMES ALGER FEE, Chief Judge.

This action was brought by Wards to recover damages against fifty-seven common carriers for failure to receive from, transport, and deliver goods to Wards' strikebound Portland establishment during an eight months period. There was a complaint filed in this case which this Court has held to be technically sufficient under the system of pleading in use in the state courts of Oregon. Motions against the complaint were reserved. An answer was filed, the motions against which were likewise reserved for decision. Many of the defenses set up by the various defendants have now been held insufficient.[1]

It was quite apparent that the complicated questions raised by the pleadings should be decided against a background of actual proven or agreed facts, rather than upon the respective statements by the lawyers in the pleadings as to assumed situations of fact. Jury trial had been demanded and it was estimated by the attorneys that from eighteen months to two years would be required for such a trial. In view of these considerations, the Court directed that the lawyers go as far as possible toward simplifying the issues so that a jury could comprehend the questions which were to be contested.

It was also of note at the outset that there would necessarily be tremendous outlays of time, energy and money in preparation for the trial, whatever procedure was followed.

It will be objected by the theorists who have never tried a case that the time involved, which from the filing of the complaint to the end of the trial, was eight years, seven months and eleven days, was unconscionable. But such a criticism takes no cognizance of the tremendous difficulties involved. The attorneys spent six years in drafting pleadings, taking depositions and collecting documents and other material. Thereafter, they spent approximately thirty-six months in continuous conference, observing court hours and sessions. There were seventeen days of formal pretrial conferences in court and an additional twenty-two days of continuous formal conference just before the pretrial order was presented for signing. These conferences were in open court and the written transcripts thereof were of inestimable value in drawing the order. The open court pretrial hearings were actually a part of the case and were conducted in the same manner as a trial.

The attorneys for the respective parties entered into the task of making the issues understandable with commendable earnestness. No mechanical process was involved, but rather the highest degree of skill, ingenuity and ethical devotion of counsel to the interests of their respective clients. To each of these lawyers, the Court pays the highest tribute for their professional zeal and ethical conduct in this fierce contest involving the whole economic structure of our time.

The lawyers have agreed upon a statement of the major objectives of the process:

"The new Federal Rules [28 U.S.C.] permit, and perhaps en-

---

1. See the opinion on the merits, Montgomery Ward & Co., Inc., v. Northern Pacific Terminal Company, D.C.Or.1953, 128 F.Supp. 475.

courage, the formation of issues outside of the pleadings. This presupposes the framing of issues after the pleadings have been completed. On the other hand, the issues must be framed before trial; for the sole purpose of the trial is to determine issues. Therefore, one of the major purposes of pre-trial in the Ward case, as we conceived it, was the determination of what was at issue. Normally, the issues of fact cannot be stated until the parties have agreed, so far as possible, on stipulations of fact and have stated their contentions as to all facts on which they cannot agree."

The process whereby the controversy was defined, along the lines set up in the formal pleadings, was by the use of the doctrine of judicial admission or, in other words, by admissions as to fact and law made by the attorneys in open court. The lawyers here fought hard to obtain exact admissions from the other side; they did not agree under the pressure of judicial thumbscrews. Most of the difficulty was with the accurate statement of the issues of law and of fact, even when all the related circumstances had been plotted by depositions, documents and admissions.

In these circumstances, the judge cannot and should not attempt to prepare for the lawyers. He cannot organize their knowledge or their evidence. But he is responsible for the fact that no unnecessary delay be granted during extended proceedings and he can insist that before a case goes to trial the issues are in a form understandable to him.

This case was tried to the Court in nine days. It could well have been tried by a jury.

Certain questions as to the adequacy of the pretrial order, its consistency, and the binding nature thereof, although not raised by the parties, seem to the Court to require a review of the entire order before the drafting of the findings of fact and conclusions of law in order that there be no misunderstanding of the basis of the final judgment.

It will be seen that in this vast document [2] prepared by the attorneys the cause of action of plaintiff is sharply delineated by its contentions based upon agreed facts. This is an extension of the formal complaint which, as the Court has already held, states a cause of action. There is then a solid basis for the entry of judgment, depending on what facts and law are found established. The issues of fact and law are accurately segregated. The claims and defenses of each individual carrier defendant are segregated with great care as to fact and law. Likewise, defenses in which several carriers join are so defined. When judgment is entered, the area of adjudication and finality will be conclusively marked.

The controversy over the measure of damages highlights the proper function of the pretrial order. It is contended on the one hand by plaintiff that, since liability has been found against each defendant, all are liable jointly and severally for all elements of damage and loss caused to plaintiff, even though other parties not joined as defendants may have contributed thereto. The defendants on the other hand postulate that no damages are recoverable at all because, it is said, so many other elements enter into the situation that defendants cannot be responsible for vague and indefinite claims of loss of earnings, and profits. Each of these positions is erroneous, although each contains some modicum of truth.

It has long been the position of the theorist that a party should not be bound by the theory of the case which he has adopted. Such a proposition re-

2. The completed Pretrial Order consists of 1420 legal-sized pages to which are attached over 2200 pages of schedules.

moves the rational basis of an action at law. An unrelated group of allegations or facts, or the transcript of a series of depositions, or even a series of admissions, has no vitality unless there is some correlation in virtue of a rule of law which predicates liability of the defendant. Similarly, defenses have like limitations.

▌ One of the principal purposes of a pretrial order of the definitive type such as we have here is to make specific the legal theories and contentions of fact upon which each of the parties is proceeding. This feature makes the controversy pragmatically justiciable. The opposed propositions furnish syllogistic organization for solution by judicial opinion or judgment, albeit the propositions of fact may be arrived at by synthesis which depends upon deduction or perhaps intuition.

▌ Where the theories of law have been applied to the particular facts so found by the first opinion of the Court, then neither party can discard the theory of liability or defense on which he has proceeded in order to adopt an inconsistent position in regard to the establishment or minimization of damages.

A summary of the portion of the completed pretrial order which was introductory to the formulation of the issues of fact and the issues of law eventually framed under the guidance of the Court is set forth in paragraphs one to 2050 of the appendix.

The issues of fact and law relating to liability are given verbatim as these appear in the pretrial order. They are set out in Part III, Sections I to XXIV, and Part IV, Sections I to XIX, of the appendix.

By this process of defining the issues, the necessity of determining many technical motions to the pleadings was eliminated. Requests to strike allegations or to make allegations more definite and certain have been answered by admissions of fact, production of documents, or formulation of issues of law. The sufficiency of the cause of action and the extent of liability have been ruled upon by the Court. The sufficiency of the defenses interposed by the various carriers were decided by the Court in the same opinion.

Resolution of these questions of liability left for determination the issues of fact and law relating to damages. Such issues, as stated in the pretrial order, appear in Part III, Sections XXV and XXVI, and in Part IV, Sections XX to XXIII.

▌ These issues as to damage are controlled by the contentions of plaintiff as to liability and the theory of recovery adopted by the Court based thereon. If the stipulations of fact as to damage are insufficiently specific to permit the allocation of items of loss as a proximate result of the factors upon which the particular cause of action against any defendant is founded, then plaintiff cannot recover such items, even if it be shown that it was damaged in that particular.

Two hearings have been held on assessment of damages. In each the Court pointed out the apparent inconsistency between the plaintiff's cause of action and the stipulation of unsegregated facts relating to Wards' loss.

▌ The pretrial order must after trial be binding upon all parties, as a judicial necessity. True, a court may grant a new trial, set a pretrial order aside, and start over. No such motion has been made here by any party.

The Court has therefore assessed damages upon the stipulations and contentions agreed upon by the parties in the definitive pretrial order, subject to the rulings previously made as to liability.

So ordered.

### APPENDIX

Part I. Preliminary Statement (pp. 2–13). Listing of the parties and their appearances; the named defendants against whom no case is

**56**

stated in this Order. The organization of this Order. Definition of terms used in the Order. Agreed limitations upon the introduction and the effect of evidence.

Summary of Part II. Statement of Agreed Facts and Contentions

1–21 (pp. 15–30)[1]. Jurisdiction and parties, including a statement of agency relationships and other affiliations among the defendants.

> Contract of sale of Whiting Truck Service to E. H. Cooper (pp. 2000–2001)[2]

22–A (pp. 31–32). Character and volume of Wards' business.

> Map of United States, showing location of all Wards' branches and the boundaries of the Portland Mail Order House territory. (p. 2002). Industrial map of Portland (p. 2003).

22–B (pp. 33–37). Physical description of Wards' Portland establishment, showing facilities for the handling of inbound and outbound shipments.

> Map of portion of Portland, showing vicinity of Wards' establishment. (p. 2004). Plat of Wards' building and surrounding property. (p. 2005). Plat of first floor of Wards' establishment. (p. 2006). Agreement for the construction of the Ladd Estate Company spur track. (pp. 2007–2011). Agreement for the construction of Wards' spur tracks and amendment thereto. (pp. 2012–2019). Easement from Ladd Estate Company to Terminal Company. (pp. 2020–2022). Easement from Wards to Terminal Company. (pp. 2023–2026). Franchise ordinance for construction of spur tracks, and amendment. (pp. 2027–2029).

22–C to 22–E (pp. 38–50). Common course of business at Wards' Portland establishment prior to the strike.

22–F (p. 51). Economies obtained by the consolidation and reshipment of merchandise at Wards' Portland establishment to its branches in the northwest.

22–G (pp. 52–53). Transportation equipment owned by Wards or available to it during the strike period.

22–H (pp. 54–57). Contentions concerning Wards' dependency upon transportation by common carrier.

22–I to 22–K (pp. 58–68). Description of Wards' standard accounting and statistical reports.

22–L (pp. 69–73). Certain of Wards' executive personnel and their duties.

22–M (pp. 74–77). Regular course of Wards' business in the preparation of bills of lading and express receipts covering merchandise shipped from Wards' Portland establishment via common carrier.

23 (pp. 78–79). Carriers other than defendants authorized to do business at or to Portland during the strike period.

> Identity, operating authority and equipment of such common carriers by truck. (pp. 2030–2112). Identity and equipment of draymen operating in Portland. (pp. 2113–2124).

24 (p. 80). Rail carrier defendants are common carriers in interstate and intrastate commerce, except that Great Northern and Northern Pacific are not common carriers in intrastate commerce in Oregon.

25 (pp. 81–121). Identity, operating authority and equipment of each motor carrier defendant.

26 (p. 122). Railway Express is a common carrier by express in interstate and intrastate commerce.

27–30 (pp. 123–126). Statutes to which the various classes of defendants are subject.

---

1. The figures in parenthesis relate to page numbers of the Pre-Trial Order and Schedules.

2. Indented material refers to the Schedules.

31 (p. 127). Wards' contentions concerning the obligations of defendants as common carriers.

32–A to 32–D (pp. 128–160). Tariffs covering movements in and out of Portland to which each defendant was a party.

Portions of rail carrier defendants' tariffs. (pp. 2125–2155). Portions of Railway Express Agency Tariff. (pp. 2156–2157). Items quoted from particular tariffs. (pp. 2158–2167).

32–E (pp. 161–163). Contracts between railroads and draymen for pick up and delivery service.

Lists of draymen employed by railroads; copies of contracts between railroads and Robertson and other draymen. (pp. 2168–2219).

32–F to 32–W (pp. 164–184). Pick up and delivery service. Contentions concerning the duty and authority to render such service.

33 (pp. 185–186). Terminal Company has sole right to use Wards' spur tracks for switching. List of motor carrier defendants which haul the bulk of Wards' motor freight.

34–A (p. 187). Robertson operated as a local drayman and contract carrier, as well as a common carrier. No claim is made against him as drayman or contract carrier.

34–B (pp. 188–190). Normal transportation of merchandise inbound to Wards prior to the strike.

Agreement between National Carloading Corporation and Wards. (pp. 2220–2221).

34–C (pp. 191–192). Normal transportation of merchandise outbound from Wards prior to the strike.

34–D (pp. 193–203). Normal course of pick up and delivery service at Wards prior to the strike.

Motor carriers who entered into contracts with Robertson covering pick up and delivery for Wards. (pp. 2222–2227).

34–E (pp. 204–212). Organization of unions and commencement of the strike at Wards.

34–F to 34–J (pp. 213–219). Services performed and not performed by defendants, and Wards' demands for service on defendants, during the strike period.

34–K to 34–N (pp. 220–224). Contentions concerning the rendering of transportation service during the strike period.

35 (pp. 225–228). Disposition of shipments during the strike period listed in the Bill of Particulars.

Terminal Company statements. (pp. 2228–2299).

36 (pp. 229–236). Communications between Wards and the rail carrier defendants and Railway Express during the strike period. Requests for service. Copies of the letters referred to above. (pp. 2300–2339).

37–A to 37–F (pp. 237–248). Shipments in the hands of rail carrier defendants during the strike.

Great Northern statements. (pp. 2340–2450). S. P. & S. statements. (pp. 2451–2586). Northern Pacific statements. (pp. 2587–2687). Union Pacific statements. (pp. 2689–2986). Southern Pacific statements. (pp. 2987–3186). Railway Express statements. (pp. 3187–3382).

37–G to 37–H (pp. 249–250). Shipments in the hands of motor carrier defendants during the strike.

Robertson Freight Lines. (pp. 3383–3396). Nehalem Valley Motor Freight. (p. 3397). S & M Truck Line. (p. 3398). Spokane-Pacific Line. (p. 3399). McCracken Bros. Motor Freight. (p. 3400). Baker Truck Line. (p. 3401). Lee & Eastes Auto Freight. (p. 3402). Martin Transfer Company. (p. 3403). Bend-Portland Truck Service, Inc. (pp. 3404–3405). Colum-

bia Truck Express. (p. 3406). Oregon Express. (p. 3407). Pacific Truck Express. (p. 3408). Pierce Auto Freight Lines, Inc. (p. 3409). Portland-Pendleton Motor Transport Company. (p. 3410). Silver Wheel Motor Freight, Inc. (p. 3411). Smart's Auto Freight Co., Inc. (p. 3412). Chaney Freight Line, Inc. (p. 3413). Consolidated Freightways, Inc. (pp. 3414–3417). Pacific Highway Transport. (pp. 3418–3419). Interstate Freight Lines, Inc. (p. 3420). United Truck Line. (p. 3421). Cater Motor Freight System, Inc. (p. 3422). Inland Motor Freight. (pp. 3423–3424).

37–I to 37–J (pp. 251–252). Contentions concerning requests for delivery service.

38 (pp. 253–259). Requests for pick up service from Wards.

Description of shipments on which shipping documents via motor carrier had been prepared. (pp. 3425–3439)

39 (pp. 260–261). Motor carriers which had shipments for delivery to Wards at locations other than Portland, that were not delivered.

Robertson. (pp. 3441–3442). McCracken Bros. Motor Freight. (p. 3443). Lee and Eastes Auto Freight. (p. 3444). Bend-Portland Truck Service. (p. 3445). Columbia Truck Express. (p. 3446). Pacific Truck Express. (p. 3447). Pierce Auto Freight Lines, Inc. (p. 3448). Rand Truck Line, Inc. (p. 3449). Silver Wheel Motor Freight, Inc. (p. 3450). Smart's Auto Freight Co., Inc. (p. 3451). Oregon Express. (p. 3452). Consolidated Freightways. (pp. 3453–3459). Pacific Highway Transport. (p. 3460). United Truck Lines, Inc. (p. 3461). Sunrise Trail, Inc. (p. 3462). Bend-Portland Truck Service. (p. 3463).

Shipments which were tendered to motor carrier defendants but which were not accepted.

Columbia Truck Express. (p. 3464). Pierce Auto Freight Lines, Inc. (p. 3465). Rand Truck Line. (p. 3466). Reddaway's Truck Line. (p. 3467). Silver Wheel Motor Freight, Inc. (p. 3468). Chaney Freight Line, Inc. (p. 3469). Pacific Highway Transport. (p. 3470). Portland-Pendleton Motor Transport Company. (p. 3471). Spokane-Pacific Line. (p. 3472). Nehalem Valley Motor Freight. (p. 3473).

41–A (pp. 262–263). Lack of records relating to Wards' customary use of the services of any particular carrier. Estimated weights shipped by the different modes of transportation.

41–B to 41–J (pp. 264–278). Shipments ready to be picked up at Wards for transportation during the strike period; records indicating what carrier would have been used.

List of shipments Wards intended to ship from its Portland Mail Order House during strike period. (pp. 3474–3478). Number of customers' stencils on file on specified dates. (pp. 3479–3482). Number of orders received at the Portland Mail Order House before, during and after the strike. (pp. 3483–3484). Dollar volume of net sales at the Portland Mail Order House before, during and after the strike. (pp. 3485–3486). Number of Fashion Mail Orders received. (p. 3487). Dollar volume of net sales at the Portland Retail Store before, during and after the strike. (pp. 3488–3489).

42–A (pp. 279–281). Wards' Transportation Efficiency Reports. Classification of transportation methods used by Wards.

Weight of shipments as shown in the Transportation Efficiency Reports. (pp. 3490–3491).

42–C (pp. 282–283). Merchandise consigned to Wards via water carrier remained on the docks during the strike period.

> List of docks within the Portland harbor area which are served by railroad trackage. (pp. 3492–3498).

42–D to 42–E (pp. 284–285). No defendant would have delivered to Wards shipments which might have been, but were not, tendered to it for delivery to Wards during the strike period.

42–F (p. 286). During the strike period, various sources, branches and customers of Wards had on hand merchandise for shipment to Wards, but the details of such intended shipments are not now available.

42–G to 42–I (pp. 287–290). Contentions with regard to shipments which might have been, but were not, tendered for shipment to or from Wards.

44–A to 44–B (pp. 291–303). Rail carrier personnel. Subjects and results of conferences between them.

44–C to 44–I (pp. 304–310). Rail carrier defendants and Railway Express made no attempts to have pick up and delivery service performed by a drayman other than Robertson. Contentions concerning a concert of action and conspiracy among the defendants.

44–J (pp. 311–328). Background of the relationship between the Teamsters Union and the Truck Operators League of Oregon.

> Membership in American Labor Unions, 1900–1940. (p. 3499). Strikes in the State of Oregon, 1916–1940. (p. 3501). Strikes in the United States, 1916–1940. (p. 3500). Major issues involved in strikes. (pp. 3502–3503). 1934 Longshoremen's Strike. (pp. 3504–3507). Criminal offenses which grew out of labor disputes, 1934–1938. (pp. 3508–3526).

44–K (pp. 329–350). Union affiliations of the employees of motor carriers. Re-

fusals of employees to serve Wards. Renegotiation of motor carrier labor contract.

> Rail movements of Wards' shipments into and out of Robertson's terminal during the strike period. (pp. 3527–3529). Shipments from Wards' sources in Portland hauled to rail terminals by contract draymen after December 16, 1940. (pp. 3530–3540). Shipments from Wards' sources in Portland hauled to rail terminals by source after December 16, 1940. (pp. 3541–3566).

44–L to 44–Y (pp. 352–366). Knowledge of each defendant concerning the service rendered to Wards by each other defendant. Contentions as to the effect of such knowledge and a concert of action between the defendants.

45 (pp. 367–368). Wards contends that it performed all the conditions required to obtain common carrier service from the defendants.

49 (pp. 369–378). Sufficiency of the physical capacity of each defendant to perform transportation services for Wards.

50–A to 50–L (pp. 379–430). Business at Wards' Portland establishment during the strike period, until its closing on May 3, 1941.

> Number of employees on payroll at the Portland Mail Order House before, during and after the strike. (pp. 3567–3572). Classification of employees at work in the Portland Mail Order House during the strike. (pp. 3573–3576). Number of employees at work in the Portland Retail Store before and during the strike. (p. 3577). Employees who went out on strike, but returned to work during the strike. (pp. 3578–3580). Comparison of hours and overtime hours worked before, during and after the strike. (pp. 3581–3588). Average output per man hour before, during and after the strike. (pp. 3589–3594). Com-

ments on the performance of various departments at Wards during the strike. (pp. 3595–3604). Wards' instructions to employees concerning the shipping of merchandise. (p. 3605). Percentage of orders not filled to total orders received at Wards' mail order houses. (pp. 3606–3610). Physical inventories. of merchandise at Wards' Portland establishment before, during and after the strike. (pp. 3611–3613). Complaints received at the Mail Order House before and during the strike. (p. 3614). Lists of records and equipment shipped to St. Paul Mail Order House and the Spokane Warehouse during the strike. (pp. 3615–3621).

50–J (pp. 431–436). The reopening of Wards' Portland establishment on July 26, 1941.

50–L (pp. 438–441). Effects of the strike on the operating costs and profits of Wards' establishments outside of Portland.

Expenses at the St. Paul Mail Order House before and during the strike. (pp. 3622–3624).

50–M to 50–N (pp. 442–443). Contentions concerning the number of persons available for employment at Wards during the strike period.

50–O to 50–Q (pp. 444–446). Contentions concerning the effect of defendants' refusals to render transportation services on Wards' ability to serve its customers in its usual manner.

51–65 (pp. 447–478). Contentions concerning items of damage claimed by Wards to have resulted from defendants' failure to render transportation service, including: Increased costs of alternative methods of transportation, loss of customer good will, increased operating and administrative costs at Portland and St. Paul, and the costs of closing the Portland establishment and moving the mail order operations to St. Paul.

67 (pp. 479–533). Loss of profit at Wards' Portland establishment. The method of computation and the items included therein. Records and lack of records supporting the figure claimed by Wards.

Net sales and net profit at Wards' Mail Order Houses before, during and after the strike. (pp. 3625–3627). Net sales and net profits at several of Wards' Retail Stores before, during and after the strike. (pp. 3628–3630). Estimated loss of profit at Mail Order House. (pp. 3631–3634). Retail Store estimated loss of profit. (p. 3635). Federal Reserve Bank statement of department store sales in the Pacific Northwest and Portland, and the estimated loss of profits based thereon. (pp. 3636–3639). Statements of employee costs claimed to have resulted from defendants' acts or omissions. (pp. 3640–3645).

68 (pp. 534–546). Claims filed by Wards with defendants and other carriers. (Loss-and-damage, depreciation and excess transportation claims have been paid or adjusted by each defendant.)

Schedule of damages resulting from failure and refusal to give service, with amendment. (pp. 3646–3650). Communications between Wards and defendants and other carriers regarding claims. (pp. 3651–3857). Portions of Wards' complaint, motion to amend complaint, and bill of particulars. (pp. 3858–3870).

69–70 (pp. 547–553). Costs of obtaining fuel oil for Wards. Costs, including costs of storage and reconsignment, of freight carried by water.

93 (pp. 553–555). Contentions concerning the willfulness of defendants.

94 (p. 556). Contentions concerning actual and punitive damages.

96–98 (pp. 557–565). Defendants' contentions concerning Wards' own acts and the strike as the cause of its damages;

that liability, if any, is several and is based on the failure to pick up and deliver specific shipments; that punitive damages are in violation of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.

100 (pp. 568–571). History of the compliance of the defendant rail carriers with the Interstate Commerce Act.

Revenue freight carried by railroads in the United States, 1929–1941. (p. 3871). Passengers carried by railroads in the United States, 1929–1941. (p. 3872). Locomotives in service in the United States, 1929–1941. (p. 3873). Freight-train cars in service in the United States, 1929–1941. (p. 3874). Freight car mileage, 1929–1941. (p. 3875).

101 (pp. 572–584). The declaration of a national emergency and mobilization of manpower; the effect thereof upon the railroads of the nation.

United States male population, 1940. (p. 3876). Number of persons entering the Army, July, 1940–June, 1941. (p. 3877). Tons of revenue freight in line haul movement to or from Portland by rail carrier defendants, 1940–1941. (pp. 3878–3879). Average number of employees of Class I railroads and Terminal Company, 1929–1941. (pp. 3880–3881).

102–103 (pp. 585–587). Transportation facilities at Portland, Oregon. Routes of defendant rail carriers.

104–122 (pp. 588–607). The operations and property of the Terminal Company.

List of industries served by Terminal Company. (pp. 3882–3884). Switching service normally performed by Terminal Company for each railroad operating at Portland. (pp. 3885–3906). Number of freight and passenger cars handled by Terminal Company. (pp. 3907–3910).

123–126 (pp. 608–612). Matters which are the subject of common interest and joint action among the rail carriers.

140–142 (pp. 613–617). The rail carriers are subject to the Safety Appliance Acts, 45 U.S.C.A. § 1 et seq., the Boiler Inspection Act, 45 U.S.C.A. § 22 et seq., and the Federal and Oregon Employers' Liability Acts, 45 U.S.C.A. § 51 et seq., ORS 654.305 et seq., and operate so as to avoid liability arising thereunder.

150–151 (pp. 618–619). Operating rules of the rail carriers.

160–162 (pp. 620–624). Classification of employees and employment procedures of the rail carrier defendants.

170–171 (pp. 625–628). Supervisory personnel of the rail carriers.

200–203 (pp. 629–639). The Railway Labor Act, 45 U.S.C.A. § 151 et seq.

Organization and rules of procedure of the National Railroad Adjustment Board. (pp. 3911–3913). Check List of the Attorney General's Committee on Administrative Procedure and the response of the National Railroad Adjustment Board thereto. (pp. 3914–3925).

204–255 (pp. 640–713). Railroad labor organizations.

260–291 (pp. 714–759). Labor agreements of defendant rail carriers and Railway Express, and the practices and policies thereunder.

Excerpts from and copies of such labor agreements. (pp. 3926–4012); (pp. 4029–4045). Seniority rosters. (pp. 4013–4028); (pp. 4046–4047).

300–315 (pp. 760–783). Pick up and delivery service. Arrangements for such service between railroads and draymen. Wards' selection of Robertson to handle its drayage.

500–502 (pp. 784–796). Physical description of the York Street Spur and connecting tracks. Switching operations and crews under normal circumstances.

Map of switch tracks serving Wards. (p. 4048).

503 (pp. 797–800). Establishment of the picket line at Wards on December 7, 1940.

504–526 (pp. 801–892). Switching attempts of Terminal Company switch crews and the activities of pickets in connection therewith.

Letter from yardmaster to union complaining of failure of switch crews to do their work. (p. 4049). List of switches attempted during strike period. (pp. 4050–4056). List of union contributors to the Montgomery Ward Strike Fund. (pp. 4057–4059).

530–532 (pp. 893–905). Wards' shipments in freight houses and yards of rail carrier defendants; picketing of freight houses.

545–546 (pp. 906–908). Defendants' contentions with regard to Wards' duty to remove obstructions from the switch tracks.

550–570 (pp. 909–933). Defendants' contentions with regard to the rights and duties of its employees, particularly with reference to serving a strike-bound industry.

Average number of employees of certain classes and the service hours of such employees before, during and after the strike, for each rail carrier defendant. (pp. 4060–4087).

575–585 (pp. 934–956). Wards' transportation of fuel oil by tank truck.

600–602 (pp. 957–962). Refusal of Railway Express employees to serve Wards. Alternative methods of delivery employed.

625 (pp. 963–965). Response of certain motor carriers to Wards' request for pick up service.

650–652 (pp. 966–976). Description of acts of violence which occurred in connection with the strike at Wards.

Reports of acts of violence during labor dispute. (pp. 4088–4135). Summary of acts of violence from December 7, 1940. (pp. 4136–4140).

653–660 (pp. 977–1040). Transportation of merchandise to and from Wards during the strike period.

Net sales of certain items compared before and during strike. (p. 4141). Local source purchases delivered to Wards during strike period compared with previous year. (pp. 4142–4235). Local source purchases intended for reshipment received during strike period. (p. 4236). Local source purchases of supplies received by Wards during the strike period. (pp. 4237–4268). Shipments delivered to Wards from Old Colonial Warehouse during the strike period. (p. 4269).

700 (pp. 1041–1042). Arrests of strikers during the strike.

750–754 (pp. 1043–1057). Tariff and bill of lading provisions governing the liability of the rail carriers.

755–766 (pp. 1058–1080). Rail carrier pick up and delivery tariffs. Option to consignee to provide own service in return for an allowance.

770–773 (pp. 1081–1088). Uniform Express Receipt used by Railway Express.

825 (pp. 1089–1091). Robertson's financial statement.

1000–1010 (pp. 1092–1110). Interstate Commerce Commission proceedings initiated by Wards against certain motor carriers.

1100–1103 (pp. 1111–1115). Proceedings before the National Labor Relations Board and the Ninth Circuit Court of Appeals against Wards. 133 F.2d 676.

1200–1211 (pp. 1116–1139). Wards' shipments arriving via water carrier. Wards' replevin actions dismissed.

Communications between Wards and steamship companies concern-

ing the disposition of shipments. (pp. 4270–4275). Storage charges paid by Wards on water shipments which arrived during the strike period. (pp. 4276–4279).

1500–1506 (pp. 1140–1155). Tariff and bill of lading provisions governing the liability of the motor carrier defendants.

National Motor Freight Classification Rules and Regulations. (p. 4280).

1507–1508 (pp. 1156–1159). Motor carrier tariff provisions governing optional pick up and delivery service.

1620–1900 (pp. 1160–1235). Defendants' contentions concerning the existence of a cause of action in Wards and defenses thereto.

1980–1989 (pp. 1236–1245). Allegations of Wards' complaint which are not at issue herein.

2000–2050 (pp. 1246–1306). Defendants' contentions. (see issues and contentions of fact and law, below).

Part III. Issues of Fact and Contentions

I. Did each defendant hold itself out to transport every commodity included within its published tariffs to and from all localities or points included in such tariffs whenever a rate of compensation applicable to such commodity was also named therein covering the transportation of the commodity between such localities or points and to perform all the services included in such tariffs or incident to such transportation?

Wards: Each defendant so held itself out.[3]

Defendants: None of the defendants so held itself out.

II. If the answer to Issue of Fact No. 1 is affirmative, was such holding out unqualified, subject only to any exceptions or conditions stated in such tariffs; or was such holding out subject to other qualifications and, if so, what were such other qualifications?

Wards: The holding out was in all relevant respects qualified only by the exceptions or conditions stated in defendants' tariffs.

Defendants:

A. The holding out is qualified not only by the conditions stated in the tariffs, but also by the general qualification that such holding out did not include any service which:

1. Was not a normal incident to the transportation services performed by the carrier.

2. Could not be performed by the carrier's regular employees and equipment.

3. Involved abnormal hazards of injury to persons and damage to property.

4. Was impracticable to perform under existing circumstances.

5. Could not be reasonably requested under existing circumstances.

6. Involved the policing of highways or other areas beyond the carrier's control.

7. Would impair the carrier's ability to perform its obligations to other shippers.

B. The holding out of the motor carriers and Railway Express was further qualified in that such holding out did not include any service which:

1. Was not within the transportation service which its operating certificates and permits authorized it to perform.

---

3. The contentions of fact of all parties are summarized following each relevant issue of fact.

2. Was of a character or volume not normally handled or reasonably to be anticipated by such carrier.

C. The holding out of the rail carrier defendants with respect to industrial switching service was further qualified in that such holding out did not include service which required switch crews or other employes to:

1. Clear industry tracks of obstructions maintained thereon to prevent switching;

2. Assault or physically contact persons attempting to prevent such switching;

3. Disregard the carriers' regular operating and other rules and instructions applicable to switching;

4. Rearrange their workshifts or change their regular assignments because of special conditions at the particular industry.

D. The holding out of each of the defendant carriers with respect to pick up and delivery service was further qualified in that it did not include any service which could not be performed under such carrier's regular arrangements (through contract draymen or otherwise) for performing pick up and delivery service in the same terminal area.

III. (a) Were all of Wards' shipments of merchandise and substantially all of Wards' shipments of supplies included among the commodities which each defendant held itself out to to transport; and

(b) Was Wards' Portland establishment a point from or to which such defendant held itself out to transport as initial carrier any such shipment outbound and as delivering carrier any such shipment inbound?

Wards: The affirmative of these propositions is contended.

Defendants:

A. None of Wards' shipments of merchandise and supplies was so included unless such carrier's tariffs prescribed charges for transporting such shipment between Portland and some other point on the line of such carrier or its connections.

B. Wards' Portland establishment was not such a "point", although said establishment was a "place of business" and an "industry" to which terminal service was extended by the respective defendants to the extent indicated by their tariffs, subject to the qualifications stated above.

IV. Immediately prior to and during the strike period were the preparations of each defendant carrier with respect to equipment, personnel and arrangements reasonably adequate to provide the transportation service which such carrier held itself out to perform in the Portland area, including service to Wards' establishment? If not, which carrier or carriers were not so prepared, and in what respect?

Wards: No contention.

Defendants: The preparations and practices of each defendant carrier were reasonable, suitable and adequate.

V. Did Wards during the strike period request any of the defendants to furnish inbound or outbound transportation service to Wards' Portland establishment and, if so, what was the date, manner and content of each of such requests?

Wards: Wards made requests as stated in Part II of this Order [4] upon the rail carrier defendants, Railway Express, Consolidated Freightways, Inc., McCracken Bros. Motor Freight, Portland-Pendleton Motor Transport Company, Bend-Portland Truck Service, Inc., Silver Wheel Motor Freight, Inc., Inland Motor Freight, Reddaway's Truck Line, Pacific Highway Transport, Pierce Auto Freight Lines, Inc., Spokane-Pacific Line, United Truck Lines, Inc., Rand Truck Line, Inc., and Robertson.

Defendants:
A. Wards did not request any defendant carrier to transport any shipment other than
   1. Shipments which were in fact transported by a defendant to or from Wards between December 7 and December 25, 1940, and
   2. Certain shipments which were in the possession of a defendant carrier between December 26, 1940 and July 26, 1941.
B. Wards did not request or purport to request any defendant to furnish transportation service except as set forth above and in Part II of this Order.

VI. Did the requests, if any, which are referred to in Issue of Fact No. 5 continue in effect throughout the balance of the strike period and, if not, how long did such requests continue in effect?

Wards: The requests remained in effect throughout the strike period.

Defendants: No request continued in effect beyond the day it was made except that
A. Any request for the movement of a shipment in the possession of a defendant continued in effect so long as the shipment remained in the possession of such defendant.
B. Any request for service to be performed on a particular day continued in effect throughout that day;
C. Other requests continued in effect for a reasonable time, but not beyond any material change in the circumstances
   1. Under which such request was made, or
   2. Under which such service was to be performed.

VII. At the time of the requests for outbound transportation service referred to in Issue of Fact No. 5 were there any shipments on the shipping floor of Wards' Portland establishment for the carrier or carriers to whom such requests were made and, if so, had shipping documents been prepared on any such shipments?

Wards: The affirmative of this proposition is contended and, further, that shipping documents routing such shipments over the lines of such carriers had been prepared to the extent stated in Part II of this Order. [5]

4. See Part II, paragraphs 35–C, 36–A, 36–B, 36–D, 37–I, 37–J, 38–A and 38–C, which deal with Wards' requests to the defendant carriers for the pick up of shipments outbound from Wards, and for the delivery of shipments in the hands of such carriers. See also paragraph 44–A, dealing with conferences between representatives of rail carriers in reference to serving Wards during the strike period.

5. See Part II, paragraphs 35–B, 38–C, 38–D, 41–B and 41–C.

Defendants: There were no such shipments or shipping documents except as set forth in Part II of this Order.

VIII. Did any defendants or groups of defendants agree or act together with reference to furnishing or not furnishing transportation service to Wards' Portland establishment during the strike period; and, if so, which defendants so agreed and so acted, and in what respects?

Wards: As stated in Part II of this Order, the rail carriers agreed and acted together [6] and the motor carriers agreed and acted together.[7]

Defendants:

A. None of the defendants or groups of defendants agreed or acted together with reference to not furnishing transportation service to Wards' Portland establishment during the strike period.

B. All conferences or discussions referred to in Part II of this Order

1. Were necessitated by the abnormal conditions which interfered with the normal methods of furnishing transportation to Wards, and

2. Were carried on for the purpose of exchanging information with respect to such conditions and finding means of furnishing transportation service to Wards' notwithstanding such abnormal conditions.

C. See also XIX, Defendants.

IX. Did any defendants or groups of defendants during the strike period fail or refuse to furnish to Wards' Portland establishment any transportation service which such defendants held themselves out to furnish; and, if so, which defendants or groups of defendants so failed or refused and in what respects?

Wards: Each defendant, and the defendants collectively as stated in VIII above, so failed and refused to furnish transportation service to Wards, except as stated in Part II of this Order.[8]

Defendants:

A. No defendant failed or refused to furnish to Wards'

---

6. Part II, paragraph 44–G (1). Wards contends that the defendant rail carriers acted in concert
   (a) in formulating answers to demands for service addressed to the several defendant rail carriers by Wards;
   (b) in adopting policies in regard to furnishing or not furnishing transportation service to Wards' Portland establishment;
   (c) in issuing instructions regarding the handling of undelivered freight consigned to Wards;
   (d) in issuing releases to the press stating their individual and collective positions in regard to furnishing transportation service to Wards at Portland.

7. Part II, paragraph 44–O lists the instances in which Wards contends that the motor carrier defendants acted in concert; each such incident deals with the relationship between the motor carriers and labor organizations representing their employees.

8. Part II, paragraph 34–F: The services of Terminal Company and the United States Postal Service enabled Wards to move in and out of its establishment during the period from December 7, 1940 to December 25, 1940, all shipments which it desired to have moved in or out of said establishment during that period. Paragraph 34–H and I: Consolidated Freightways made one delivery by truck to Wards during the strike period; Railway Express on several occasions picked up and delivered merchandise at Wards by private automobile.

Portland establishment any transportation service which such defendant

1. Held itself out to perform under the conditions then existing,
2. Furnished under like conditions, or
3. Was capable of rendering under such conditions.

B. There was no interruption, suspension or delay in the transportation of Wards' inbound shipments to the Portland terminals or of Wards' outbound shipments from such Portland terminals.

C. Such interruption, suspension or delay as occurred in the handling of any of Wards' shipments during the strike period affected only the movement of such shipment between the carrier's Portland terminal and Wards' Portland establishment.

X. If the holding out of any of the defendant carriers was subject to qualifications of any character (whether stated in carrier tariffs or not) did the circumstances and conditions involved in transportation service to or from Wards' Portland establishment during the strike period fall within any of such qualifications:

Wards: No circumstances or conditions relevant to the present case fell within any qualifications to the holding out of any of defendant carriers.

Defendants:

A. All of the abnormal conditions referred to in XII below fell within qualifications to the holding out of each of the defendant carriers.

B. None of the defendant carriers held itself out to perform transportation service under the conditions referred to in XII below.

XI. If the answer to Issue of Fact No. 10 is affirmative, did any of such circumstances or conditions cause or contribute to any failure of common carrier service to or from Wards' Portland establishment during the strike period? If so, how and to what extent?

Wards: No contention.

Defendants: Such interruption, suspension or delay as occurred in the handling of any of Wards' shipments between carrier terminals and Wards' Portland establishment during the strike period was due entirely to the then existing abnormal conditions referred to in XII below, all of which resulted from the acts and omissions of Wards, its striking employees and third parties and not from any act or omission of any defendant carrier.

XII. Were conditions under which the defendant carriers were requested to perform transportation service to and from Wards' Portland establishment during the strike period abnormal? If so,

(a) in what respects were such conditions abnormal, whose acts or omissions caused or contributed to such abnormal conditions, and to what extent?

(b) did such abnormal conditions cause or contribute to any failure of any transportation service to or from Wards' Portland establishment during the strike period; and, if so, to what extent?

Wards: During the strike period, there did not exist

A. Any physical interference with defendants' common carrier transportation service to Wards' Portland establishment; or

B. Any real or substantial danger to the person or property of defendants, their employees or agents, if they furnished, or attempted to furnish such service.

Defendants:

A. Throughout the strike period the conditions under which the defendant carriers were requested to perform transportation service by motor vehicle to and from Wards' Portland establishment were abnormal in that said establishment was strikebound and such transportation

1. Required the performance of service not normally incident to common carrier transportation,

2. Could not be performed by the carrier's regular employees, or under the carrier's regular arrangement for carrying on such transportation,

3. Involved abnormal hazards of injury to persons and damage to property,

4. Involved the policing of highway and other areas beyond the carrier's control,

5. Would have unduly interfered with the carrier's service to other shippers, and

6. Would have impaired the carrier's ability to perform its carrier obligations.

B. Between December 23, 1940 and July 26, 1941, the conditions under which the defendant rail carriers were requested to perform switching service to and from Wards' Portland establishment were abnormal in that said establishment was strikebound and the performance of such switching service would have required switch crews or other carrier employees to:

1. Clear industry tracks of barricades maintained thereon to prevent such switching,

2. Assault or physically contact persons attempting to prevent such switching,

3. Police areas beyond the carriers' property,

4. Disregard the carrier's regular operating and other rules and instructions applicable to switching,

5. Rearrange their work shifts, and change their regular assignments, because of special conditions at Wards' establishment,

6. Carry on operations in a manner and on schedules which would have unduly interfered with switching service to other industries, and

7. Do work not normally incident to switching service.

C. Acts and omissions of Wards caused or contributed to the conditions under which transportation service to and from Wards' Portland establishment would have to be performed (either by the defendant carriers, other common carriers or other persons) during the strike pe-

riod, and caused or contributed to all failures of such transportation services in that Wards

1. Engaged in unfair labor practices,
2. Engaged in a labor dispute with its employees,
3. Caused and prolonged the strike by such acts,
4. Permitted its striking employees to block access to its establishment,
5. Failed to remove the abnormal hazards of injury to persons and damage to property involved in such transportation service,
6. Failed to keep open means of ingress and egress to and from said establishment for rail or highway transportation,
7. Failed to maintain conditions under which the performance of such service would have been practicable, and
8. Permitted the causes and conditions referred to above to continue throughout the strike period.

XIII. Did any acts or omissions of third persons (not parties to this action) during the strike period cause or contribute to (a) the conditions under which transportation service to and from Wards' Portland establishment would have to be performed; (b) to any failure of transportation service to and from Wards' Portland establishment?

If so, what were such acts or omissions and to what extent did they cause or contribute to such conditions or such failure?

**Wards:** See XII, above.

Defendants:

A. Acts or omissions of third persons so contributed, in that

1. Many individuals, acting singly or in groups, undertook to prevent transportation service to or from said establishment by various unlawful means, including acts of violence, threats of violence, insulting and profane comments (including "fighting words"), unlawful assemblies, rioting, intimidation, and blocking access by rail or highway to said establishment by congregating on tracks and highways and placing physical obstructions thereon.

2. Many persons not directly involved as principals in the commission of such unlawful acts encouraged, aided and abetted such individuals in the commission of such acts.

3. Peace officers charged with the duty of maintaining law and order and preserving the peace in the city of Portland, and particularly in the vicinity of Wards' Portland establishment, failed to prevent, restrain or control the unlawful acts referred to above.

4. City police officers who were present and witnessed many of the unlawful acts referred to above failed to interfere therewith, refused to arrest any of the offenders (except upon written complaint of some person willing to act as private

prosecutor), and permitted the continuation and repetition of many of such unlawful acts from day to day throughout the strike period.

B. All failures of transportation service to or from Wards' Portland establishment during the strike period (either by any of the defendant carriers, other common carriers or other persons) were directly and proximately caused by the acts and omissions of Wards, and of third persons.

XIV. If circumstances or conditions tending to interfere with transportation services by any of the defendants or groups of defendants to and from Wards' Portland establishment existed during the strike period, what efforts, if any, did the defendant affected make to overcome such circumstances or conditions?

Wards: If there existed such circumstances, all of the defendants failed and refused to make reasonable efforts or exercise reasonable care to overcome such circumstances or conditions.

Defendants: Notwithstanding the abnormal circumstances and conditions which existed during the strike period and tended to or did interfere with transportation service to or from Wards' Portland establishment, the respective defendants nevertheless

A. Attempted to and did furnish transportation service to said establishment to the extent of their ability under such circumstances and conditions,

B. Made all reasonable efforts to overcome such circumstances and conditions, including the efforts referred to in Part II of this Order [9], and

C. Exercised reasonable care with respect to the matters referred to above.

XV. If any circumstances or conditions tending to interfere with transportation services to and from Wards' Portland establishment existed during the strike period, what efforts, if any, did Wards make to overcome such circumstances or conditions?

Wards: If there existed such circumstances, and if they existed on Wards' property and were within Wards' physical control, Wards made reasonable efforts to overcome and did overcome such circumstances and conditions.

9. Part II, paragraph 1685, recites in detail the unusual service extended by Terminal Company from December 7 to December 22, 1940, the attempts to complete switching thereafter, the cooperation of the rail carrier defendants in making deliveries to Wards at points in Portland and elsewhere other than at its Portland establishment, and the transportation of Wards' shipments by the rail carriers under fictitious bills of lading. In paragraph 1785 are listed the attempts of the motor carrier defendants to compel their employees to perform services for Wards, the cooperation of the motor carriers in diverting shipments originally consigned to Wards and the use of motor carrier terminals by Wards to assemble and distribute shipments. In paragraph 1885, Railway Express lists the efforts it made to serve Wards during the strike period, including the transportation of an unusually large volume of merchandise between December 7 and December 25, 1940, the pick up and delivery of merchandise at Wards by private car thereafter, and allowing Wards the use of its facilities for handling merchandise, including the assembling and marking of merchandise.

Defendants: Notwithstanding the abnormal conditions and circumstances, Wards did not

A. Remove or change any of such circumstances or conditions so that transportation service to or from its Portland establishment would be practicable, or

B. Make any reasonable or other effort to overcome such circumstances or conditions.

XVI. Did any defendants or groups of defendants fail or refuse to exercise reasonable care or to make reasonable efforts to furnish to Wards' Portland establishment during the strike period such transportation services, if any, as such carriers held themselves out to perform? If so, which carrier or carriers so failed or refused and in what respects?

Wards: See XIV, above.

Defendants: See XIV, above.

XVII. Were the transportation services actually rendered to Wards by the respective defendant carriers during the strike period reasonable in character and extent under the conditions then existing? If not, in what respects and to what extent were such services not reasonable?

Wards: No contention.

Defendants: The transportation services actually rendered to Wards by the respective defendant carriers during the strike period were reasonable in character and extent under the conditions then existing.

XVIII. Were Wards' requests of the respective defendant carriers for transportation services during the strike period beyond those actually rendered by such carriers reasonable under the conditions then existing?

Wards: No contention.

Defendants: No request by Wards of any defendant carrier for transportation service during the strike period beyond that actually rendered was reasonable under the conditions then existing.

XIX. Was any failure or refusal of any defendant carrier to perform any transportation service to and from Wards' Portland establishment during the strike period willful; and, if so, which carrier or carriers so acted and in what respects?

Wards: The failures and refusals of all of the defendants were willful, as stated in Part II of this Order.[10]

Defendants: The course of action (including both acts and omissions) of each of the defendant carriers with respect to transportation service to and from Wards' Portland establishment during the strike period

A. Was taken by the carrier in the honest exercise of its own business judgment as the best or only course open to it in the abnormal circumstances then existing,

B. Was believed by the carrier to be in accord with its legal duties and obligations in such circumstances,

10. Part II, paragraph 93–A.

C. Was believed by the carrier to be reasonable,

D. Was in fact reasonable.

XX. Was Wards dependent upon (a) common carrier service, (b) other transportation service, between its Portland establishment and other points of origin and destination before and during the strike period to carry on the regular course of business of its Portland establishment; and, if so, in what respects and to what extent?

Wards: Wards was dependent upon common carrier service to carry on its regular course of business, as stated in Part II of this Order.[11]

Defendants:

A. To carry on the regular course of business of its Portland establishment prior to the strike period, Wards

1. Utilized its own specially selected agencies (draymen, sources' trucks and parcel post) to deliver to its establishment the great bulk of its inbound merchandise and supplies,

2. Utilized its own specially selected agencies (draymen and parcel post) to truck out of its establishment substantially all of its outbound merchandise including that sold to its customers,

3. Depended upon no single type of transportation, but utilized all existing types of transportation, including parcel post, freight forwarders, water carriers, local draymen (including Wards' contract draymen) and

trucks operated by local sources, and

4. Was not dependent upon the defendant carriers for transportation of merchandise and supplies to or from its Portland establishment.

B. To carry on the business of its Portland establishment during the strike period, Wards' dependency upon transportation service to and from its establishment was the same as such dependency prior to the strike period as set forth above.

XXI. Did any act or omission of Wards cause or contribute to any failure of transportation services (either by the defendant carriers, other common carriers or other persons) to or from Wards' Portland establishment during the strike period; and, if so, what were such acts or omissions and to what services and to what extent did they cause or contribute to such failure?

Wards: No act or omission of Wards caused or contributed to any failure of such transportation services.

Defendants: See XII, XIII and XV above.

XXII. If the answer to Issue of Fact No. 9 is affirmative as to any defendant or groups of defendants, did the failure or refusal of such defendants deprive Wards' Portland establishment of any of the common carrier services which would have been utilized by said establishment in the regular course of business during the strike period; and, if so, were the services of

11. Part II, paragraph 22–H.

which Wards was thus deprived services which such defendants customarily rendered to said establishment or services which said defendants were capable of rendering to said establishment during the strike period, and what were the natures and extent of such services?

Wards: The failures and refusals of each of the defendants and groups of defendants deprived Wards of all of the services which such defendant or groups of defendants were capable of rendering to Wards' Portland establishment during the strike period subsequent to such failures; that Wards would have utilized such services in the regular course of business during the strike period; and that the nature and extent of such services of which Wards was thus deprived were as stated in Part II of this Order.[12]

Defendants: See IX above.

XXIII. If any non-defendant transportation agency or agencies failed or refused to provide transportation service to or from Wards' Portland establishment during the strike period, did any such failure or refusal deprive Wards' Portland establishment of any transportation services which would have been utilized by said establishment in the regular course of business during the strike period; and, if so, were the services of which Wards was thus deprived services which such non-defendant transportation agencies customarily rendered to said establishment or services which such agencies were capable of rendering to said establishment during the strike period, and what were the nature and extent of such services?

Wards: No contention.

Defendants:

A. During the strike period various non-defendant transportation agencies (including parcel post, sources' trucks, freight forwarders, motor carriers, local draymen, including Wards' contract drayman) failed or refused to provide transportation service to or from Wards' Portland establishment.

B. The services of such non-defendant transportation agencies were customarily used by Wards' Portland establishment in the regular course of business.

C. Except for the abnormal conditions which interfered with or prevented transportation service to and from Wards' Portland establishment during the strike period such non-defendant transportation agencies were capable of rendering and would have rendered service to said establishment during the strike period.

D. As indicated above, Wards was thus deprived of services which such non-defendant transportation agencies customarily rendered to Wards' Portland establishment.

12. Part II, paragraph 49–A to 49–H states the physical capacity of each defendant carrier to render transportation services to Wards under normal conditions.

**XXIV.** To what extent, *if at all, were* Wards' business, profits and losses affected during the strike period by

(a) the labor dispute and strike at Wards' Portland establishment;

(b) acts or omissions of Wards;

(c) acts or omissions of the defendants severally or collectively;

(d) acts or omissions of others than the parties to this action?

**Wards:** Acts or omissions of defendants individually, and of groups of defendants who agreed and acted together, substantially contributed to all of the reduction in Wards' business and profits and all of Wards' losses during the strike period, and that no act or omission of Wards substantially contributed thereto.

**Defendants:**

A. During the strike period, Wards' business, profits and losses were directly affected by

1. The labor dispute and strike at Wards' Portland establishment,

2. Acts and omissions of Wards, and

3. Acts and omissions of third persons, but not by any act or omission of the defendants severally or collectively.

B. It is ·impossible from any of the facts set forth in this Order or otherwise to determine the extent to which any of the factors referred to above affected Wards' business, profits or losses during the strike period; but such factors collectively caused all loss or damage which Wards claims to have sustained and seeks to recover in this action.

**XXV.** If the answer to Issue of Fact No. 9 is affirmative as to any defendants or groups of defendants, did such failures or refusals cause damage to Wards, and, if so, of what kinds and in what amount?

**Wards:** Such failures and refusals caused damages to Wards as described in Part II of this Order.[13]

**Defendants:** No act or omission of any of the defendants or groups of defendants during the strike period caused or contributed to any damage to Wards.

**XXVI.** If the answers to Issues of Fact Nos. 19 and 25 are affirmative as to any defendants or groups of defendants, are punitive damages allowable against such defendants or groups of defendants, and, if so, in what amounts?

**Wards:** Punitive damages are allowable against all of the defendants in the amount of $1,500,000.

13. Wards contends that its Portland and St. Paul Mail Order Houses failed to make profits in the amount of at least $1,306,926 (paragraph 67–W); that its Portland Retail Store failed to make profits in the amount of at least $190,895; that in order to obtain deliveries of fuel oil at its Portland establishment it was required to pay an excess cost of $2,940.-93; that it incurred storage charges at steamship terminals in the amount of $4325.30; and that it was required to pay additional transportation costs for reshipment to its Spokane Warehouse in the amount of $4829.50.

Defendants: No punitive damages in any amount are allowable against any of the defendants or groups of defendants.

Part IV

### I. Jurisdiction

1–W [14] Does this Court have jurisdiction of the parties to this case and of the subject matter thereof?

1–D Does the determination of any of the material issues in this case require the determination of administrative questions within the primary jurisdiction of

(a) the Interstate Commerce Commission;

(b) the Public Utilities Commissioner of Oregon?

2–D If determination of any of the material issues in this case requires determination of administrative questions of the character referred to in Issue of Law 1–D

(a) does this Court have jurisdiction to decide such questions in advance of a determination thereof by the Interstate Commerce Commission or by the Public Utilities Commissioner of Oregon, or at all;

(b) can this Court decide the other issues in this case in advance of a determination of such administrative questions?

### II. Holding Out

2–W Did each defendant hold itself out as a common carrier to transport every commodity included within its published tariffs to and from all localities or points included in such tariffs whenever a rate of compensation applicable to such commodity was also named therein covering the transportation of the commodity between such localities or points, and to perform all of the services included in such tariffs or incident to such transportation?

9–D Can any of the tariffs referred to in this Order be construed to require any of the defendant carriers, not only to transport commodities between the points named in such tariffs and perform the services normally incident to such transportation, but also to perform whatever extra services may be found to be necessary in order to extend carrier service to a strikebound plant beyond carrier property, including such extra services as

(a) removing barricades maintained on private spur tracks by strikers to prevent switching service to such plant;

(b) removing from public streets strikers and others stationed thereon to block access to such plant by highway vehicle;

(c) policing the areas in the vicinity of such plant to protect carrier employees and property from injury or damage by strikers and others?

If so, which tariff or tariffs, which carrier or carriers, and what extra services? If not, were any of the carriers either required or permitted to perform any of such extra services?

### III. Qualifications to Holding Out

3–W Was the holding out of any of the defendants as a common carrier qualified by any exception or condition, whether stated in its tariffs or not,

---

14. The letters "W" and "D" refer to Issues of Law submitted respectively by Wards and Defendants.

(a) which limited the service to be furnished to a strikebound shipper in any respect additional to the limitations on the service which it furnished to shippers generally; and

(b) which limited the obligation, if any, of the carrier to use reasonable efforts to overcome any circumstances or conditions tending to interfere with furnishing to a strikebound shipper the service which it held itself out to give to shippers generally?

If so, was such exception or condition valid?

6–D  To what extent, if at all, was the holding out of each of the defendant carriers (see Issue of Fact No. 1) qualified by requirements, limitations or conditions imposed by

(a) Federal statutes, including rules, regulations and orders issued pursuant thereto?

(b) state statutes, including rules, regulations and orders issued pursuant thereto?

7–D  If the holding out of any of the defendant carriers was subject to any qualifications other than those imposed by law, were such qualifications

(a) lawful,

(b) reasonable?

### IV.  Law Governing

7–W  If the answers to Issues of Law Nos. 4 and 6 are affirmative, could either of the obligations thus imposed on each defendant as a common carrier by the common law be legally limited to any extent by any intention of the carrier

(a) to hold itself out as a common carrier only under the Interstate Commerce Act, 49 U.S. C.A. § 1 et seq. and other statutes relating to transportation service; or

(b) to assume only the obligations of a carrier imposed by the Interstate Commerce Act and other statutes relating to transportation service?

If so, in what manner must such intention be expressed?

8–W  Had the common law obligations of defendants, if any, and the common law remedies for the breach of such obligations, if any, as set forth in response to Issues of Law Nos. 4 and 6, been abridged or supplanted by Federal or Oregon statutes prior to or during the strike period?

3–D  To what extent, if at all, were the carrier obligations (if any) of each of the defendant carriers with respect to each shipment referred to in this Order, determined by

(a) the Interstate Commerce Act and other Federal statutes, including rules, regulations and orders issued pursuant thereto;

(b) the statutes of Oregon, including rules, regulations and orders issued pursuant thereto;

(c) the common law (if any) of

(1)  England,

(2)  the United States,

(3)  the State of Oregon,

(4) the state wherein the transportation contract was or would have been entered into,

(5) the state or states wherein the transportation contract or any part thereof was, or was intended to be, performed by such carrier?

4–D  To what extent, if at all, was each of the defendant carriers required to shape its policies, manage its affairs and carry on its operations (insofar as

same are involved in this case) in conformity with

(a) the national transportation policy of the United States as declared in the Interstate Commerce Act and related Acts, and in decisions, orders, rules and regulations issued pursuant to such Acts;

(b) the national labor policy of the United States as declared or reflected in Federal statutes, including the Railway Labor Act, 45 U.S.C.A. § 151 et seq., the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Norris-LaGuardia Act, 29 U.S.C.A. 101 et seq., the Clayton Anti-Trust Act, 15 U.S.C.A. § 17, 29 U.S.C.A. § 52, the Strikebreakers Act, 49 Stat. 1899, 52 Stat. 1242, 18 U.S.C.A. § 1231, the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., and the Safety Appliance Acts, 45 U.S.C.A. §§ 1 to 46, and in orders, decisions, rules and regulations issued by administrative agencies pursuant to such acts?

5–D   To what extent, if at all, were the carrier obligations of each of the defendants to private shippers (such as Wards) qualified or affected by

(a) the national transportation policy of the United States;

(b) the national labor policy of the United States;

(c) statutes of the State of Oregon, or of other states, relating to carriers or to labor?

8–D   In holding themselves out to perform transportation service, did the respective defendant carriers

(a) assume the obligations of common carriers under the common law; or

(b) assume only the obligations of carriers under the Interstate Commerce Act and other statutes relating to such transportation?

V.   Obligation To Receive and Deliver

4–W   Did each defendant upon request during the strike period have a common law obligation as a common carrier to accept commodities for transportation and to transport them in accordance with its holding out; and, if so, was there a common law remedy for the breach of such obligation?

5–W   If the answer to Issue of Law No. 4 is affirmative as to any defendant, were the requests for service, if any, made by Wards to such defendant during the strike period sufficient to impose upon such defendant said common law obligation to accept and transport?

6–W   Did each defendant without request, upon acceptance of commodities for transportation in accordance with its holding out, have a common law obligation as a common carrier during the strike period to transport them to destination and to deliver them to the consignee in accordance with its holding out; and, if so, was there a common law remedy for the breach of such obligation?

22–W   Were the requests, if any, made by Wards for common carrier transportation services which defendants held themselves out to perform legally subject to any requirement of reasonableness; and, if so, to what extent?

16–D   During the strike period were any of the defendant carriers obligated to furnish to Wards'

Portland establishment any transportation service requested by Wards if such request was not reasonable under all the circumstances and conditions then existing?

17–D During the strike period were any of the defendant carriers legally obligated under the conditions then existing to render to Wards' Portland establishment any service beyond the transportation service actually rendered? If so, which carrier or carriers and what service?

## VI. Prima Facie Case

10–W Does proof that

(a) Wards requested defendants to accept commodities for common carrier transportation from Wards' Portland establishment in accordance with their holding out, and that defendants (or persons to whom defendants delegated performance) then failed or refused to accept such commodities for such transportation; or that

(b) defendants accepted commodities for common carrier transportation to Wards' Portland establishment and that defendants (or persons to whom defendants delegated performance) then failed or refused to complete such transportation

establish a prima facie case against defendants for breach of their obligation to furnish such transportation service?

11–W Upon proof by Wards of a prima facie case against defendants for failure or refusal to perform common carrier transportation services, must defendants, in order to rebut such prima facie case, prove by a preponderance of the evi-

dence a lawful excuse for such failure or refusal?

38–D As between Wards and the respective defendant carriers which has the burden of proof with respect to

(a) the reasonableness of Wards' requests of such carriers for transportation service to and from Wards' Portland establishment under the abnormal conditions which existed during the strike period;

(b) whether such requests were for service which the carrier held itself out to perform under such conditions;

(c) the reasonableness, both in character and extent, of the transportation service actually rendered to Wards by such carrier during the strike period?

## VII. Delegation of Duties

9–W Did the delegation by any defendant to any person of the performance of part of the common carrier transportation services which it held itself out to perform, induced by any considerations not amounting to legal coercion, relieve such defendant of its obligation to perform such services, or diminish that obligation?

10–D Did any of the line-haul rail carrier defendants violate any obligation to Wards by making the arrangements shown in this Order whereby such carrier depended solely upon

(a) the Terminal Company for the switching of cars to and from Wards' Portland establishment;

(b) Gustave Robertson for the hauling of pickup and delivery shipments to and from said establishment?

11–D Do the facts stated in this Order show that Wards is es-

topped, as a matter of law, from questioning the reasonableness or the adequacy of the preparation or arrangements of the respective line-haul rail carrier defendants whereby such carriers depended solely upon

(a) the Terminal Company for the switching of cars to and from Wards' Portland establishment;

(b) Gustave Robertson for the hauling of pickup and delivery shipments to and from said establishment?

12–D (a) Did any of the motor carrier defendants violate any obligation to Wards by making the arrangements shown in this Order whereby such carrier depended upon Gustave Robertson for the hauling of motor carrier shipments to and from Wards' Portland establishment?

(b) Do the facts stated in this Order show that Wards is estopped, as a matter of law, from questioning the reasonableness or the adequacy of the preparation or arrangements of any of the motor carrier defendants whereby such carrier depended upon Gustave Robertson for the hauling of motor carrier shipments to and from Wards' Portland establishment?

13–D (a) With respect to the transportation and handling of shipments between Wards' Portland establishment and the Portland terminals of the respective line-haul carriers, to what extent, if at all, was Gustave Robertson

(1) the agent of Wards

(2) the agent of the line-haul carrier

(3) the joint agent of Wards and the line-haul carrier?

(b) Do the facts stated in this Order show that Wards is estopped as a matter of law from asserting or contending that Robertson's preparation and arrangements for hauling shipments to and from Wards' Portland establishment were inadequate or unreasonable because of his labor agreements or labor policies?

19–D Were any of the defendant carriers who by arrangements made at Wards' request depended upon Gustave Robertson to haul Wards' pickup and delivery shipments to and from its Portland establishment under any obligation to Wards, upon the failure of Robertson to do such hauling, to make some special arrangement for the handling of such shipments for the duration of the strike?

VIII. Physical Interference

12–W If, during the strike period, there existed

(a) physical interference with defendants' common carrier transportation service to Wards' Portland establishment; or

(b) real and substantial danger to the persons or property of defendants, their employees or agents, if they furnished, or attempted to furnish such service;

would any of such circumstances, conditions or anticipated consequences constitute the basis of a lawful excuse for defendants' failure to furnish such service? Would any other circumstances, conditions or anticipated consequences constitute such basis?

18–D  As between Wards and the defendant carriers, who is legally chargeable with the abnormal conditions which tended to interfere with transportation service to and from Wards' Portland establishment during the strike period?

IX. Efforts to Overcome Interference

13–W  If any circumstances, conditions or anticipated consequences constituted the basis of a lawful excuse for any failure or refusal of defendants to furnish common carrier transportation service to Wards' Portland establishment during the strike period, what efforts, if any, were defendants required by law to make to overcome such circumstances or conditions, or to avoid such consequences?

14–W  If any circumstances, conditions or anticipated consequences constituted the basis of a lawful excuse for any failure or refusal of defendants to furnish common carrier transportation service to Wards' Portland establishment during the strike period, what efforts, if any was Wards required by law to make to overcome such circumstances or conditions, or to avoid such consequences?

23–D  As between Wards and the defendant carriers was it the duty of Wards, upon requesting any of such carriers to furnish transportation service to or from its Portland establishment, to keep open the means of access to said establishment so that the performance of such service would be practicable?

24–D  If it was practicable for Wards to truck merchandise and supplies to and from its Portland establishment during the strike period was Wards obligated to deliver and receive its shipments at carrier terminals in order to

(a) avoid unnecessary interference with carrier service to other shippers;

(b) avoid or minimize any of Wards' losses?

25–D  Can any of the defendant carriers be held liable to Wards for any loss or damage which Wards, with reasonable effort, could have avoided or prevented?

X. Bills of Lading

23–W  Is the present action one for loss, damage or delay within the meaning of the uniform bills of lading or the uniform express receipt; and, if not, are any of the rights or obligations of the parties hereto nevertheless governed by any provision of the uniform bills of lading or the uniform express receipt?

31–D  To what extent, if at all, were the respective defendant carrier's obligations, if any, to serve Wards' Portland establishment during the strike period affected by provisions of such carrier's uniform bill of lading or uniform express receipt with respect to

(a) riots or strikes (see Paragraphs 750–A(7), 770–A(5) and 1500–A(7);

(b) acts or defaults of the shipper (see Paragraphs 750–A(7), 770–A(5) and 1500–A-(7);

(c) reasonable dispatch in transportation (see Paragraphs 750–A(8) and 1500–A-(8)?

XI. Option for Pickup and Delivery

24-W Did the provisions contained in certain of defendants' tariffs which granted to the consignor or consignee an allowance of five cents per cwt. when he elected to make his own arrangements for pickup and delivery grant the option only to the consignor or consignee to make said arrangements and claim said allowance; and, if so, was the consignor or consignee entitled to exercise said option solely for his own benefit and his own purpose, or was he required under the circumstances of the present case to exercise said option at any time or for any purpose to benefit the carrier?

32-D (a) To what extent, if at all, were the rights and obligations of the respective parties affected by tariff provisions (see Paragraphs 757-A and 1507-A of Part II) whereby shippers could elect to perform, or make their own arrangements for the performance of, pickup and delivery service authorized by such tariffs?

(b) To what extent, if at all, were the rights and obligations of the respective parties in regard to the pickup or delivery of shipments at Wards' Portland establishment during the strike period affected by tariff provisions with respect to

(1) impracticability of operations (see Paragraphs 761-A and 1505-A);

(2) loading shipments on highway vehicles and receipting therefor (see Paragraph 763-A)?

XII. Rights and Duties of Carrier Employees

25-W Did the agreements, working rules or principles, observed by any of defendant carriers (or any groups or associations of defendant carriers) and the employees or representatives of the employees of any defendant carriers, which are described in this order, provide or contemplate that all such employees would exercise reasonable care or make reasonable efforts to furnish the common carrier transportation services which such carriers held themselves out to furnish?

26-W Did any of the labor agreements, working rules or principles which are referred to in Issue of Law No. 25

(a) limit the employees' duties to those normally incident to their respective jobs;

(b) limit the employees' work to that which could be performed without exposing such employees to abnormal risks of personal injury;

(c) limit the right of the employer to dismiss or discipline employees except for just cause and after a fair hearing;

(d) permit employees to observe established union principles; or

(e) require the employer to maintain closed shop policies?

27-W If any of the labor agreements, working rules or principles which are referred to in Issue of Law No. 25 interfered or tended to interfere with furnishing any of the common carrier services which defendant carriers held themselves out to furnish to Wards' Portland establishment, were such labor agreements, working rules or principles lawful or unlawful; and, if unlawful, in

what respects and to what extent?

**14–D** Were any of the carrier labor agreements, interpretations thereof, working rules or principles referred to in this Order unlawful or unreasonable because same

(a) limited the employees' duties to those normally incident to their respective jobs;

(b) limited the employees' work to that which could be performed without exposing such employees to abnormal risks of personal injury;

(c) limited the right of the employer to dismiss or discipline employees except for just cause and after a fair hearing;

(d) permitted employees to observe established union principles;

(e) required the employer to maintain closed shop policies?

## XIII. Physical Capacity of Defendants

**28–W** Would the proved or admitted adequacy of any preparations by defendant carriers to provide common carrier transportation services to Wards' Portland establishment or any other place in the Portland area relieve defendant carriers from the obligation, if any, of proving a lawful excuse for any failure or refusal by them to furnish transportation services to Wards' establishment during the strike period?

## XIV. Services Actually Rendered

**29–W** Would the proved or admitted reasonableness of any common carrier transportation services actually rendered by defendant carriers to Wards relieve defendant carriers from the obligation, if any, of proving a lawful excuse for any fail-

ure or refusal by them to furnish other transportation services to Wards' establishment during the strike period?

## XV. Carrier Practices

**30–W** Would the proved or admitted existence of any carrier practices relieve defendant carriers from the obligation, if any, of proving a lawful excuse for any failure or refusal by such carriers to furnish transportation services to Wards' Portland establishment during the strike period?

**15–D** Were any of the carrier practices referred to in this Order unlawful or unreasonable? If so, which practices and in what respects?

## XVI. Services Customarily Rendered

**31–W** Would the proved or admitted fact that any defendant carriers had not customarily rendered to Wards' Portland establishment some or all of the common carrier services which such carriers held themselves out to furnish relieve such carriers from the obligation, if any, of proving a lawful excuse for any failure or refusal by them to furnish such services to Wards' establishment during the strike period?

## XVII. Acts of Non-Defendants

**32–W** Did the failure or refusal, if any, of nondefendant transportation agencies to furnish to Wards' Portland establishment any transportation services which they customarily rendered, or which they were capable of rendering,

(a) constitute, in whole or in part, an excuse for any failure or refusal of defendants to furnish any transportation

service to Wards' Portland establishment; or

(b) reduce to any extent any liability which defendants might otherwise have to Wards?

22–D Can any of the defendants be held liable to Wards for any failure of transportation service which was caused or contributed to by any act or omission of third persons, including federal, state and local governments and their respective officers and agencies?

XVIII. Wards' Labor Practices

33–W Would the actual or alleged facts that

(a) "Wards was guilty of unfair labor practices";

(b) "such unfair labor practices caused and prolonged the strike of Wards' employees at its Portland establishment";

(c) "such unfair labor practices tended to and did burden or obstruct interstate commerce";

(d) Wards sought "to escape the consequences of its own wrongs by imposing on defendant carriers the burden of overcoming the abnormal conditions created by such unfair labor practices";

(e) Wards sought "to escape the consequences of its own wrongs by passing on to such carriers the losses sustained by Wards because of such unfair labor practices"; or

(f) Wards sought "to cast onto common carriers, and ultimately onto the public, the cost of Wards' private labor strife" bar Wards from maintaining the present suit; or constitute the basis of a lawful excuse for any failure by defendants

to give common carrier transportation service to Wards' Portland establishment; or relieve defendants from the obligation, if any, of proving that they exercised reasonable care or made reasonable efforts to give such service?

20–D Can any of the defendants be held liable to Wards for any failure of transportation service which was caused or contributed to by any act or omission of Wards?

21–D Can any of the defendants be held liable to Wards for any failure of transportation service which was caused or contributed to by

(a) the labor dispute between Wards and its employees;

(b) the strike at Wards' Portland establishment;

(c) the picketing of said establishment;

(d) activities of Wards' striking employees, and others acting in their behalf in connection with such strike?

34–D To what extent, if at all, do the Decision and Order of the National Labor Relations Board and the Decision and Decree of the United States Circuit Court of Appeals for the Ninth Circuit described in Paragraphs 1100–A and 1101–A of this Order constitute a conclusive adjudication, or estop Wards from denying,

(a) that Wards was guilty of unfair labor practices;

(b) that such unfair labor practices caused and prolonged the strike of Wards' employees at its Portland establishment;

(c) that such unfair labor practices tended to and did burden and obstruct interstate commerce and transportation

to and from its Portland establishment:

35–D To what extent, if at all, is it consistent with the public policy of the United States for its Courts to aid Wards, as an employer guilty of unfair labor practices, to escape the consequences of its own wrongs by

(a) imposing on the defendant carriers the burden of overcoming the abnormal conditions created by such unfair labor practices; or

(b) passing on to such carriers the losses sustained by Wards because of such unfair labor practices?

36–D Regardless of whether Wards was or was not guilty of unfair labor practices, is it consistent with the public policy of the United States for its Court to permit or enable Wards to cast onto common carriers, and ultimately onto the public, the costs of Wards' private labor strife?

XIX. Wards' Actions against Steamship Companies

37–D To what extent, if at all, did Wards by the compromise, settlement and dismissal of its actions against the steamship companies referred to in Paragraphs 1202–A and 1203–A of this Order.

(a) receive satisfaction for damages which it seeks to recover from the defendants herein; or

(b) release or discharge the defendants herein, or any of them, from liability asserted against them by Wards in this action?

XX. Damages—Interstate Commerce Act

26–D Do any of the amounts claimed by Wards as damages in this action come within the term "allowances" as used in the Interstate Commerce Act, including Sections 10(3); 15(13); if so, which amounts, are such amounts reasonable, were they covered by tariff provisions (and if so, which provisions), and could they lawfully be paid?

29–D To what extent would payment of any of Wards' claims or demands by any defendant carrier constitute an unlawful

(a) preference or advantage to Wards;

(b) prejudice or disadvantage to other shippers;

(c) rebate or concession to Wards?

30–D (a) Was Wards required, as a condition precedent to recovery from any defendant carrier of any of the damages which Wards seeks to recover in this action, to file a claim therefor with such carrier?

(b) If the answer to (a) above is affirmative, were the claims filed by Wards with the respective defendant carriers legally sufficient?

33–D To what extent, if at all, are the Report and Order of the Interstate Commerce Commission in Docket No. MC–C–268 and sub. Nos. 1 to 12, Montgomery Ward & Co., Incorporated v. Consolidated Freightways, Inc.

(a) binding upon Wards in this action;

(b) subject to collateral attack in this action; and

(c) subject to review, modification or annulment in this action or otherwise than as provided in Title 28 United States Code, Sec. 2321 et seq.?

### XXI. Joint Liability

15–W Did any agreement or acting together by any defendants or groups of defendants, with reference to furnishing or not furnishing transportation service to Wards' Portland establishment during the strike period, constitute a conspiracy?

16–W If any defendants or any groups of defendants failed or refused without lawful excuse to furnish to Wards' Portland establishment any common carrier transportation services which they held themselves out to furnish, and but for such failure or refusal such defendants or groups of defendants could have furnished such services, are such defendants or groups of defendants liable for all of the proximate consequences to Wards of the lack of such services?

17–W Were any defendants or groups of defendants joint or concurrent tort feasors; and, if so, is their liability, if any, joint and several?

18–W If the acts or omissions of any defendants or groups of defendants substantially contributed to any damages suffered by Wards during the strike period, are such acts and omissions a proximate cause of all of such damages?

27–D Would the carrier liability, if any, which could arise from the facts shown in this Order consist only of liability with respect to each individual shipment and

(a) constitute a separate claim or cause of action as to each such shipment;

(b) involve only the particular defendant to which such shipment was or would have been tendered or delivered for transportation?

(c) be limited to such loss or damage, if any, as might be shown to have resulted directly from the wrongful failure of such defendant to receive, transport or deliver that particular shipment?

28–D Could any two or more of the defendants

(a) assume joint carrier obligations to Wards, or

(b) incur any joint liability to Wards for the violation by any one defendant of its separate carrier obligations to Wards? If so, which carriers, what obligations and what liabilities?

### XXII. Computation

19–W If the acts or omissions of any defendants or groups of defendants were a proximate cause of any damages suffered by Wards during the strike period, can Wards' recovery from such defendants be prevented, or limited below a just and reasonable estimate of the damages thus caused, by uncertainty or lack of precise computation of the amount of such damages?

### XXIII. Actual and Punitive Damages

20–W If any defendants are liable to Wards for actual damages suffered by it, which defendants are liable and in what amount?

21–W If any defendants are liable to Wards for punitive damages, which defendants are liable and in what amounts?