**UNITED STATES of America,**
Libelant,

v.

**AN ARTICLE OF DRUG, ETC., ACNO-TABS,** Respondent,

and

**Pannett Products, Inc., Claimant.**

**Nos. C-694-61 and C-476-62**
**(Consolidated).**

United States District Court
D. New Jersey.

Aug. 2, 1962.

David M. Satz, Jr., U. S. Atty., by Sidney E. Zion, Asst. U. S. Atty., for libelant.

Lum, Biunno & Tompkins, by Charles H. Hoens, Jr., and Joseph R. McMahon, Newark, N. J., for claimant.

Albert Viault, Manhasset, N. Y., (New York Bar), of counsel for claimant.

SHAW, District Judge.

An action *in rem*, pursuant to the provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 334, was commenced by Libelant by filing of Libel of Information in the United States District Court for the Southern District of California on June 12, 1961, to accomplish seizure of 219 individually cartoned bottles of a product described as "Acnotabs" and to obtain a decree of condemnation of the seized product on the ground that it was a drug introduced into interstate commerce and misbranded within the meaning of 21 U.S.C.A. § 352(a). Pannett Products, Inc., a New York corporation, intervened, alleging ownership of the products seized. By stipulation of Libelant and Claimant, the action pending in the Southern District of California was removed for trial to this District.

A second libel, directed against the same product and involving further seizure of additional quantities, was filed in the United States District Court for the Southern District of New York on April 2, 1962. Pannett Products, Inc., intervened in this case as owner and, hence, the same parties and the same product are involved in both cases.

By Order of this Court dated May 15, 1962, on application of Claimant, Pannett Products, Inc., the action pending in the Southern District of New York was transferred to this District and consolidated with the action pending here. Trial by jury, initially demanded by Claimant, was waived by both parties, and consent to the transfer above mentioned was confirmed at pretrial with agreement of counsel that trial of the consolidated actions would proceed in this District to final adjudication on the merits.

It was stipulated at pretrial of the consolidated cases that Acnotabs, the subject matter of this litigation, was a drug which had been introduced into interstate commerce by Claimant, and further stipulated that the only issue to be tried was whether the drug, Acno-

tabs, was misbranded by reason of false and misleading statements in the labeling within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S. C.A. § 352(a). By the language of the pertinent statutory provision a drug shall be deemed to be misbranded when labeling is false or misleading in any particular.

Exhibits G–1, G–2 and G–3 were marked in evidence by consent. G–1 consisted of two pieces of printed matter: (1) a leaflet entitled "To All Teenagers" and (2) a form of questionnaire attached to a reply card with other printed matter and addressed to Pannett Products, Inc. It was stipulated that this exhibit represented the labeling involved in the California case.

Exhibit G–2 consisted of four pieces of printed and graphic matter: (1) a leaflet entitled "To All Teenagers" with a red box on the first page entitled "Important"; (2) the same form of questionnaire and business reply card as shown on Exhibit G–1; (3) a piece of printed and graphic matter entitled "Now Stop Pimples Where They Start Inside Your Body!" bearing the picture of a young man holding a mask; (4) a piece of printed and graphic matter entitled "Now Stop Pimples Where They Start Inside Your Body!" bearing a picture of a young lady holding a mask. It was stipulated that Exhibit G–2 represented the labeling involved in the New York case.

Exhibit G–3 consists of the label on each bottle of Acnotabs and the label on the retail carton in which the bottle was packaged. It was stipulated that Exhibit G–3 represented the bottle label and the carton label of Acnotabs involved in both the New York and California cases.

The business reply card with attached questionnaire and printed material under the caption "We Want Your Opinion" is the same in Exhibit G–1 as in Exhibit G–2. But there are some differences in the phrasing of the text of the leaflet [1] constituting the labeling in the

---

1. Text of leaflet (G–1):
   [Front—page 1]
   "TO ALL TEEN-AGERS (and their parents!)
   "Important news about medical science's latest discovery for . . . ACNE PIMPLES
   "READ THIS FOLDER CAREFULLY
   "ACNOTABS an internal medication for ACNE [Pimples]"
   [Inside—page 2]
   "Don't suffer embarrassment of ACNE PIMPLES!"
   "3 out of 5 teen-age boys and girls have acne pimples at one time or another.
   "Just having pimples is no disgrace. As doctors will tell you, however, it's advisable to do something about these blemishes as soon as you see them starting to appear on your face. The quicker you start, the quicker you can be free of them.
   "So it's important that you know what causes this complexion problem and have the benefit of science's latest advice about how to clear it up as quickly, as effectively as possible.
   "Unfortunately, many youngsters and young adults have just continued to suffer with pimples, week after week—unable to find real help.

   "While many 'cosmetic' or cover-up type of preparations have been available, they do little or nothing to prevent pimples. Even so-called medicated lotions, ointments and sticks (so messy!) often offer only temporary or minor relief—with pimples soon recurring.
   "This is why the discovery of new ACNOTABS is of such great importance. For the first time it offers an effective internal medication to combat *the real cause* of pimples. Thus ACNOTABS bring you the most rational treatment yet developed for this serious problem!
   "ACNOTABS, Trademark of Pannett Products, Inc., U.S. Trademark and Pat. Applied For."
   [Inside—Across pages 2 and 3]
   "CLINICAL STUDY PROVES AMAZING RESULTS
   "New ACNOTABS tablets have been carefully and thoroughly tested by doctors. For an average of 4½ months, they treated and observed a group of typical boys and girls suffering with acne pimples, some even with severe cases. Results were literally amazing. Maximum improvement was often achieved in as little as 3 weeks.
   "And remember, these results are credited entirely to this new internal medica-

California case and the leaflet [2] constituting the labeling in the New York case and, as noted above, the leaflet constituting the labeling in the New York case

tion—ACNOTABS tablets. Diet of patients was not restricted at all. No ointments, no external treatment were used.

"In many cases, remarkable improvement was visible in as little as 7 days!"

[Inside—page 3]

"A Revolutionary New MEDICAL PRINCIPLE

"Pimples start from *within* * * * thus treatment should be from *within*!

"Medical scientists have long observed that a clear, healthy complexion during teen years may depend upon having higher than normal amounts of certain nutritional elements. Unfortunately, they have also noted that youngsters' regular diet is often deficient in these elements.

"When this leaves skin cells out-of-balance, acne pimples erupt on the surface. Treating them on the surface, however, cannot reach the true source of the trouble—*inside the body where pimples really start*!

"This is why, for nearly 20 years, doctors have worked to develop an internal medication for pimples that would be fast and effective in its action. Now, at last, they've discovered the remarkable combination of medicines to achieve this—ACNOTABS.

"These wonder tablets clear up pimples *from inside the body*—quickly, safely, and even in stubborn cases. ACNOTABS do this by magically providing the nutritional elements you may lack. Then acne pimples soon start fading away. What's more, the tone, coloring and texture of your skin are greatly improved.

"Only Internal Medication You Can Buy

"Remember there's nothing else you can buy that's even remotely like ACNOTABS. This scientifically-tested formula is exclusive. It's the only internal medication that clears up acne pimples so fast, so effectively."

[Outside—page 4]

"SAFE AS VITAMINS TO TAKE!

"The exhaustive clinical studies showed that ACNOTABS have absolutely no harmful side-effects. There was not one case of unpleasant reactions. Taken as directed, ACNOTABS are as safe as vitamins for teen-agers.

"DIRECTIONS FOR TAKING

"Take one tablet 3 times a day after meals until pimples have cleared up. (When you first start taking ACNOTABS, in a few cases new pimples may erupt—but these were already on their way before you began this new medica-

tion. It is merely an indication that ACNOTABS have started to work, within your body, to rebalance the structure of your skin cells . . . combatting the internal cause of surface blemishes.)

"Don't be discouraged if your skin does not respond the first day or two. Be sure to continue taking 3 tablets every day and soon your mirror will show you the start of a wonderful improvement!

"Even after ACNOTABS have successfully cleared up pimples, these blemishes may return within a few weeks—but usually in a much milder form. In these rare cases, start taking ACNOTABS again, but just one tablet daily should then be all you need, to keep your skin healthy and clear. Isn't this a small price to pay for keeping your face blemish-free?

"When your supply of ACNOTABS is exhausted, get another bottle. It's only $5.95 for 72 tablets, a 24-day supply—that's just a quarter a day.

"Tell your friends about ACNOTABS too. Don't let anyone you know suffer another needless day from acne pimples.

"PANNETT PRODUCTS, INC., NEW YORK, N.Y.

"MONEYBACK GUARANTEE

"If not completely satisfied with results after taking ACNOTABS, we will gladly refund what you paid. Send unused supply to us with your name and address. Refund check will be mailed at once."

2. Text of leaflet (G–2):

[Front—page 1]

"TO ALL TEEN-AGERS (and their parents!)

"IMPORTANT For any good medication to be really effective, it must be taken exactly as directed. Be sure you take ACNOTABS 3 times everyday. Be sure you take the entire bottle. In severe cases, a second bottle may be needed for best results.

"Important news about medical science's latest discovery for . . .

ACNE PIMPLES

"READ THIS FOLDER CAREFULLY

"ACNOTABS an internal medication for ACNE [PIMPLES]"

[Inside—page 2]

"Don't suffer embarrassment of ACNE PIMPLES!

"3 out of 5 teen-age boys and girls have acne pimples at one time or another.

"Just having pimples is no disgrace. As doctors will tell you, however, it's advisable to do something about these

has a red box on the first page within which the word "Important" is set forth in bold type followed by printed instructions for the use of Acnotabs. The general import of the language of the leaflets, however, is much the same, and

blemishes as soon as you see them starting to appear on your face. The quicker you start, the quicker you can be free of them.

"So it's important that you know what causes this complexion problem and have the benefit of science's latest advice about how to clear it up as quickly, as effectively as possible.

"Unfortunately, many youngsters and adults have just continued to suffer with pimples, week after week—unable to find real help.

"While many 'cosmetic' or cover-up type of preparations have been available, they do little or nothing to prevent pimples. Even so-called medicated lotions, ointments and sticks (so messy!) often offer only temporary or minor relief—with pimples soon recurring.

"This is why the discovery of new ACNOTABS is of such great importance. For the first time it offers an effective internal medication to combat *a real cause* of pimples. Thus ACNOTABS brings you a sound, more rational treatment for this serious problem!

"ACNOTABS, Trademark of Pannett Products, Inc., Pat. Applied for."
[INSIDE—Across Pages 2 and 3]

"CLINICAL STUDY PROVES AMAZING RESULTS

"New ACNOTABS tablets have been carefully and thoroughly tested by doctors. For an average of 4½ months, they treated and observed a group of typical boys and girls suffering with acne pimples, some even with severe cases. Results were literally amazing. Maximum improvement was often achieved in as little as 3 weeks.

"And remember, these results are credited entirely to this new internal medication—ACNOTABS tablets. Diet of patients was not restricted at all. No ointments, no external treatment were used.

"In many cases, remarkable improvement began in as little as 7 days!"
[Inside—page 3]

"A Revolutionary New MEDICAL PRINCIPLE

"Pimples often start from *within* . . thus treatment should be from *within!*

"Scientists have long observed that a clear, healthy complexion during teen years may depend upon having higher than normal amounts of certain nutritional elements. Unfortunately, they also noted that youngsters' regular diet is often deficient in these elements. (Many adults have the same problem!)

"When this leaves skin cells out-of-balance, acne pimples may erupt on the surface. Treating them on the surface, however, cannot reach the true source of the trouble—*inside the body where pimples so often start!*

"This is why, for years, doctors worked to develop an internal medication for pimples that would be fast and effective in this action. Now, they've discovered a remarkable combination of medicines to achieve this—ACNOTABS.

"Yes, ACNOTABS clear up pimples *from inside the body*—quickly and safely. ACNOTABS do this by providing the nutritional elements your skin may lack. Then acne pimples soon start fading away. Tone, coloring and texture of skin improve too.

"Only Internal Medicine With This Proof!

"Remember, ACNOTABS is the *only* internal medication with the clinical proof of results reported below. No other product has ACNOTABS' evidence showing how fast, how effectively it can clear up pimples. So always be sure to get this scientifically-tested formula.

"SAFE TO TAKE!

"Exhaustive tests showed ACNOTABS have absolutely no harmful side-effects. There was not one case of unpleasant reactions. Taken as directed, ACNOTABS are safe."
[BACK—Page 4]

"DIRECTIONS FOR TAKING:

"Take one tablet 3 times a day after meals until your pimples clear up.

"Some boys and girls have noticed a fresh outbreak of pimples shortly after starting to use ACNOTABS. When you first start taking them, you may find a few new pimples still erupting. If this should happen, remember—these blemishes were already on their way before you began this new medication. It merely indicates that ACNOTABS have started to work, within your body, to re-balance the structure of your skin cells * * * combating an internal cause of surface blemishes.

"IMPORTANT FOR SEVERE CASES

"Don't be discouraged if your skin doesn't respond in the first few days. Be sure to continue taking 3 tablets every day. Soon your mirror should show the start of a wonderful improvement. If yours is

it is not deemed necessary for the purpose of resolving the issue of misbranding to attribute any practical significance to the minor differences in text or form of presentation. In fact, it would require a most alert and attentive mind, skilled in analytic reading, to read each of these leaflets separately and record in the process of the separate reading a difference in import. Detection of the minor changes of text is possible only by comparison, line for line. The overall import, however, to the average reader would be the same.

The drug, Acnotabs, is a combination of pancreatin, bile salts, pepsin, and Vitamins A and C. According to the carton and bottle labels (Exhibit G–3 in evidence), there are 72 Acnotab tablets in a bottle. Acnotabs are advertised by the label as a drug which is "an internal medicine for acne (pimples)." The instructions for dosage, quoted from the carton label in which the individual bottle is packaged, are:

"Take one tablet three times a day after meals or as directed by your physician. For complete directions, see enclosed folder."

The enclosed folder to which reference is made is the leaflet identified in Exhibits G–1 and G–2.

Acne, referred to medically as "acne vulgaris," is a disease of the skin. It is prevalent during adolescence and manifested by oiliness of the skin, blackheads, red pimples, pus pimples, and small boils. The degree of severity varies with the individual case. Some individuals will have a few blackheads; others will have a combination of blackheads and pimples; and still others will suffer from the entire combination of blackheads, pimples and boils; and, within these categories, there are varying degrees of severity. Most people outgrow the susceptibility to this disease after adolescence. Among those afflicted, and during the period of affliction, the disease does not run a uniform course. There are periods of spontaneous improvement followed by spontaneous regression due to natural causes, the precise nature of which is unknown. As stated by the medical experts, the course of the disease during adolescence has its "ups and downs."

In medical terms, a blackhead is a comedone; the red pimple is a papule; the pus pimple is a pustule; and eruptions resembling small boils are described as cysts. The comedone is described as an excessive horny formation at the follicular opening of the skin cell which prevents excretion from reaching the skin surface. Secondary infection creates the papule and the pustule and, in some cases, the final development into a cyst. It seems to be generally conceded by the medical testimony that, without the formation of the comedone, there would be no subsequent development of papules and pustules or, probably, of cysts. Dr. McCarthy, testifying for Libelant, stated that cysts will develop independently of formation of comedones. Dr. Baer testified otherwise. It was further stated in the testimony that, while there would be no papules or pustules without the comedone, it did not follow that papules and pustules would

an unusually severe case, a second bottle of ACNOTABS may be needed for results. Keep taking ACNOTABS as thousands have—don't give up hope! "Even after ACNOTABS have successfully cleared up pimples, these blemishes may return later—usually in a much milder form. In these rare cases, start taking ACNOTABS again. One tablet daily should then be all you need, to keep skin clear. Isn't this a small price to pay for keeping your face blemish-free?

"When your supply of ACNOTABS is exhausted, get another bottle. Only $5.95 for 72 tablets. "Tell your friends about ACNOTABS too. Don't let anyone you know suffer another needless day from acne pimples. "PANNETT PRODUCTS, INC. 370 Lexington Ave., New York 17, N.Y. "MONEY-BACK GUARANTEE "If not completely satisfied with results after taking the full bottle of ACNOTABS, we will gladly refund your entire purchase price. Simply return empty bottle with your name and address."

always develop from the comedones. Hence, we have the varying pattern of the manifestations of this skin condition.

No single prescription or standard method of treatment which has been effective in all cases in any substantial degree has heretofore been discovered by medical science. Various methods of treatment have been tried, with overall minimum effect, consisting generally of diet restriction, external applications to dry the skin, use of vitamins (principally Vitamin A and Vitamin C in combination or Vitamin A alone), antibiotics, hormonal treatment, ultra-violet light radiation, x-ray radiation, and others, depending upon the individual case and the opinion of the individual treating physician. There has been no unanimity of opinion in the medical field as to the efficacy of any one of the known methods of treatment. In fact, Dr. McCarthy, testifying for Libelant, indicated by his testimony that, if any drug could be found which would be 25% effective, it would be a wonderful discovery.

Claimant contends that its product, Acnotabs, has been shown to be an effective treatment for acne with results in improvement of the skin condition ranging from a low percentage in some cases up to 100% in others over relatively short periods of time. The medical theory is that Acnotabs combat the formation of the comedone and thereby eliminate the subsequent formation of the papule, pustule, and cyst. Claimant does not base this contention upon any theory of the rationale of change in body chemistry which the drug causes in order to effect the result claimed. In fact, it is conceded that the real underlying cause of the basic disturbances in the human metabolism which create excess production by the oil glands and the horny formation of the comedone is not definitely known to medical science. One of the generally accepted theories is that these disturbances are due to hormonal imbalance. As a corollary, Claimant further admits, by the testimony of the medical experts upon which it relies, that it does not know precisely what occurs in the human metabolism when Acnotabs are taken, but that effectiveness in the elimination of the comedone has been established by clinical testing. Claimant points out, in connection with this, that the same holds true in the field of medical science with respect to many other drugs in common use having beneficial effects in treatment which was discovered only by clinical testing and without knowledge of the rationale of the effect. Claimant relies, therefore, primarily upon the result of studies and clinical tests made by Dr. Shane and Dr. Kelter in the use of this drug in the treatment of patients suffering from acne.

Dr. Shane, a general practitioner, testified that he used the drug on a number of patients suffering from acne. He kept a record of the progress of these patients, which is set forth on a chart marked G–7 in evidence. The chart shows onset of improvement within one to three weeks after taking Acnotabs. It further shows, as to maximum improvement, that this was achieved over periods ranging generally from three weeks to nine weeks. Results in terms of ultimate improvement are stated in percentages ranging up to 100%. The patients were graded as to the degree of severity of the acne at the time they started taking the drug in categories of one, two, three and four plus. One plus represented a mild case; four plus represented a severe case.

Dr. Kelter, a well-qualified internist, also reported success, in lesser degree, in the treatment of acne patients with Acnotabs. He, too, kept a record of the progress of each of thirty-nine patients whom he treated, and this record, in chart form (C–13 in evidence), noted improvement in terms of percentages ranging from 20% to 100% over periods of time ranging from two and one-half weeks to twenty-nine weeks while taking Acnotabs.

There is no proof of the results of any clinical tests made by Libelant. According to certain of Libelant's Answers to Claimant's Interrogatories (received in

evidence), Libelant did make plans shortly before trial to have clinical tests made by Dr. Smith of Johns Hopkins University Hospital, Baltimore, Maryland, at that hospital and "scheduled to begin May 9, 1962, or as soon thereafter as patients became available." The approximate proposed number of acne patients to be tested was forty, with a test period running over a period of twelve weeks and with teenagers predominating as patients. Obviously, the findings of such clinical tests would not have been available for the trial of this case since it began on June 4, 1962, on the application of claimant for an early trial. The ground for urgency was alleged to be the second seizure and anticipated multiple seizures.

Libelant relies for its affirmative proof primarily upon the testimony of Dr. Baer and Dr. McCarthy, each of whom is a specialist in the field of dermatology. Both expressed the opinion, based upon their medical evaluation of the ingredients in Acnotabs and on their knowledge of authoritative literature dealing with treatment of acne, together with clinical experience in treatment of patients, that the use of Acnotabs would be of no value in the treatment of acne. Dr. Baer, expressing his opinion as to the value of Acnotabs in the treatment of acne, stated: "They cannot be expected to be effective on the basis of the present medical knowledge." When asked his opinion as to whether the *combination* of ingredients in Acnotabs would constitute effective treatment for acne, he answered: "There is nothing in the literature to indicate that it would be." The substance of the testimony of Dr. McCarthy is, in essence, the same, both doctors taking the position that clinical testing would be fruitless because no single one of the ingredients in Acnotabs could be considered as effective and that the combination of these particular ingredients could not be expected to have any greater potential.

The issue may be further narrowed at this point by stating that bile salts, pepsin, and pancreatin alone or in combination are not alleged to have any potential for the treatment of acne. The controversy centers about whether they, in combination with Vitamin A and Vitamin C, which make up the product Acnotabs, increase the potency of the vitamin content.

It was conceded by Libelant's medical experts that there was reputable medical authority which held to the opinion that Vitamin A, and Vitamin A in combination with Vitamin C, were effective to a limited extent in the treatment of some cases of acne. In fact, Dr. Baer testified that he had used Vitamin A in combination with Vitamin C in the treatment of acne vulgaris, but he stated that he had discontinued such use because he found it to be of no value. He further stated that he did not recognize any Vitamin A preparation alone as an adequate treatment for acne vulgaris but that in some instances Vitamin A alone, in adequate doses over a substantial period of time, was considered by him as a useful adjunct treatment in some cases of acne vulgaris. He recognized no value in the use of Vitamin C either alone or in combination with Vitamin A. Commenting upon the theory of those who recommended the use of Vitamin A, Dr. Baer stated:

"Nobody assumes that it goes to the internal cause. The hypothesis behind the use of Vitamin A in acne is that it may have an effect on the excess horn formation at the opening of the duct through which oily material from the skin glands empty out on the skin surface."

In the use of Vitamin A as an adjunct treatment in some cases of acne, Dr. Baer stated his recommended dosage to be 25,000 to 150,000 units daily. An Acnotab tablet contains 10,000 units.

It was admitted by Dr. McCarthy that, in some instances where each of the ingredients in a particular drug used alone had little value, the combination was found to be effective. It was his opinion that this did not apply to the ingredients in Acnotabs because no one of these ingredients could be expected

to increase the potential of the other. Moreover, the debatable value of the effectiveness of the vitamins for treatment of acne was emphasized. Though conceding that the use of Vitamin A, and Vitamins A and C in combination, had been recognized by some medical authorities as having some effect in the treatment of acne, the testimony in the Libelant's case was to the effect that such opinion was more prevalent in earlier medical publications than it is today, and neither Dr. Baer nor Dr. McCarthy felt that the vitamins were very effective in the treatment of the disease even as an adjunct to other forms of concurring therapy. It was further stated that there was no recognition in medical literature of beneficial effects from the use of Vitamin A in the limited dosage contained in Acnotabs.

It was Dr. Kelter's opinion that Vitamin A was most intimately involved in the physiology of the skin and its metabolism and that this was accepted universally today. He stated that, when he first began to use Acnotabs for the treatment of his patients, he did not quite understand the relationship of bile salts, pepsin, and pancreatin to Vitamin A and Vitamin C, but that he was aware of the fact that bile salts and pancreatin were essential for the absorption of the fat soluble vitamins. He went on to describe bile salts, pepsin, and pancreatin as enzymes and stated that the role of enzymes is to accelerate actions and to facilitate, accelerate, and initiate reactions. After observing improvement in the patients that he treated with Acnotabs, he reached the conclusion that the combination of the ingredients in this drug had a greater potency than the combination of Vitamins A and C alone. Thus, the substance of the medical theory in Claimant's case would seem to be that Vitamin A, and Vitamins A and C in combination, have some potential for the treatment of acne and that this potential is made much more effective by using these vitamins in combination with bile salts, pepsin, and pancreatin. This is the theory that the medical experts of

Libelant deny, contending, first, that vitamins have little, if any, value in the treatment of acne generally and that such value as they may have in a few cases could not possibly be increased by the addition of bile salts, pepsin, and pancreatin.

The report of the clinical studies conducted by Dr. Shane and Dr. Kelter was not considered by Dr. Baer and Dr. McCarthy as having any real value. It was the opinion of these experts that the manner in which the studies were conducted as indicated on the charts prepared by Dr. Shane and Dr. Kelter left open such broad areas for error that the findings could not be considered as having any real scientific significance. Among other factors which would lead to error in the findings shown by the charts, it was stated that there was no information compiled as to the kinds of acne from which the patient was suffering at the time treatment with Acnotabs began; that the grading in terms of severity as one through four plus was meaningless in dealing with a disease like acne; that no control by means of a placebo was used; that subjective estimates of improvement as related by patients and their parents and as observed by the physicians were included; and that the number of subjects was too small and the period of observation time too short to reach definitive scientific conclusions of a reasonably accurate nature when dealing with a disease such as acne with its many variations accompanied by spontaneous improvement and exacerbations.

The necessity for a double blind control was particularly emphasized for the purpose of maximum objectivity in the findings. With the double blind control, the subjects are paired, and one is given the Acnotab tablet and the other is given a pill identical in appearance which consists of an inert substance described as a placebo. Neither the subjects nor the investigator know during the course of the study which of the subjects are taking the Acnotabs. This it is said would eliminate a very substantial mar-

gin of error by excluding from the findings subjective impressions of the investigator and subjects and by establishing an index from the group taking the placebo of the percentage in that group where improvement occurred which could not be attributed to the drug being tested.

There is no proof from which any inference could be drawn that the drug would have an injurious effect upon health, and it is regretable that no clinical tests were made on either side with such controls that a more accurate assessment of the degree of effectiveness of this drug for treatment of acne could be made. As the record stands, the Court has before it the testimony of two well-qualified dermatologists on the Libelant's side who base the medical opinions expressed upon extensive experience in diagnosis and treatment of skin disease, and their knowledge of medical literature relating to the evaluation of the ingredients in Acnotabs, particularly the efficacy of the vitamin content, for treatment of acne. On the other side, there is testimony of one general practitioner and of a well-qualified internist who treated patients suffering from acne with Acnotabs and observed beneficial results as a consequence of which each expressed the opinion that the drug was effective in substantial degree despite some variations in the extent of improvement among the patients treated.

Before proceeding to assess the probative weight of the testimony, it would be well at this point to dispose of one argument of the Claimant raised in its Post-Trial Brief, filed in lieu of oral summation, to the effect that the New York action should be dismissed because it involved a second seizure of the same drug prior to any decree of condemnation in the California case or, in the alternative, that, if the New York action is not subject to dismissal, Libelant at least has a greater burden of proof to sustain in the New York case.

The argument for dismissal of the New York action is grounded in the proviso of the statutory enactment, 21 U.S.C.A. § 334(a), the language of which is quoted as follows:

" \* \* \* *Provided, however,* That no libel for condemnation shall be instituted under this chapter, for any alleged misbranding if there is pending in any court a libel for condemnation proceeding under this chapter based upon the same alleged misbranding, and not more than one such proceeding shall be instituted if no such proceeding is so pending, except that such limitations shall not apply (1) when such misbranding has been the basis of a prior judgment in favor of the United States, in a criminal, injunction, or libel for condemnation proceeding under this chapter, or (2) when the Secretary has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Department that the misbranded article is dangerous to health, or that the labeling of the misbranded article is fraudulent, or would be in a material respect misleading to the injury or damage of the purchaser or consumer. \* \* \* "

The tenor of the argument is that the action for the second seizure does not come within any one of the exceptions mentioned in the statute allowing the same. Regardless of any merit that the argument might otherwise have, the answer to it at this time is that the defense to the New York action which claimant seeks to interpose now was not specifically set forth as an affirmative defense in the answering pleading in that case, nor was it raised at pretrial of the consolidated cases. In Paragraph 2 of the Answer filed by Claimant in the New York action, it is stated:

"Claimant denies each and every other allegation addressed to the articles that are the object of said libel, and particularly that said articles are misbranded within the meaning of Title 21 U.S.C. § 352(a), and liable to seizure within the meaning of Title 21 U.S.C. § 334."

The general nature of the denial set forth therein, even if it could be considered to suffice for the purpose of raising the defense, is such that there would be an open question as to whether it was so intended. Nevertheless, the provisions of the Pretrial Order are dispositive of Claimant's argument, because once the issues are settled in pretrial proceedings by a pretrial order the case goes to trial on the issues there determined, with exception only in cases where there would be manifest injustice. Olson v. Shinnihon Kisen K.K., 25 F.R.D. 7 (E.D.Pa.1960).

The Pretrial Order entered after the pretrial on June 1, 1962, provides, according to stipulation of the parties, that trial of the consolidated cases will proceed in this District on the merits. Paragraph 8 of the Pretrial Order reads as follows:

> "It is stipulated and agreed that the only issue to be decided in the case is whether the seized drugs are misbranded by virtue of false or misleading statements in their labeling within the meaning of 21 U.S.C. 352(a), Federal Food, Drug and Cosmetic Act."

The purpose of a definitive Pretrial Order is to make specific the legal theories on which each party is proceeding and to crystallize and formulate the issues to be tried. Ward & Co. v. Northern Pacific Terminal Company of Oregon et al., 17 F.R.D. 52 (D.C.Ore. 1954); Blanken v. Bechtel Properties, Inc., 194 F.Supp. 638 (D.C.D.C.1961). There was no application by Claimant to amend the Pretrial Order at any time prior to or during the trial of the case, and, at this time, the right to inject a new issue must be denied.

Claimant also takes the position that it was not necessary for it to plead the exception to the statute as a matter of defense, but that the burden rested upon Libelant to prove that the statutory exception did not apply. Where there is a general clause in a statute and a proviso stating exceptions to the application of the general clause, the moving party, being Libelant in this case, is not required to plead the exception. The exception is a matter of defense to be raised in an answering pleading. United States v. King & Howe, 78 F.2d 693 (2d Cir.1935); Tobin for and on Behalf of Wiley v. Wilson, 98 F.Supp. 131 (D.C. Ill.1951); Walling v. Wabash Radio Corp., 65 F.Supp. 969 (D.C.Mich.1946); Schmidtke v. Conesa, 141 F.2d 634 (1st Cir.1944); Walling v. Cory et al., 5 F. R.D. 81 (D.C.Me.1946).

Parenthetically, it may be mentioned. that, after the Claimant raised the specific defense of immunity from the second seizure in its brief filed after trial, Libelant, in a reply brief, annexed a copy of a finding of fact by the Commissioner of Food and Drugs dated May 28, 1962, the tenor of which is that the labeling of the article "Acnotabs" by Pannett Products, Inc., "would be and is in a material respect misleading to the injury and damage of the purchaser or consumer." Claimant argues that this cannot be treated as part of the record. The Court agrees. But neither can Claimant come forth now with a defense not asserted as a matter of record prior to or during trial.

The second, alternative, contention of Claimant to the effect that Libelant has a greater burden of proof in the New York case than in the California case is not supported by any authority and is without merit.

Libelant has the burden of proving by a preponderance of the credible evidence that Acnotabs, when introduced into interstate commerce, were misbranded. 443 Cans of Frozen Egg Product v. United States, 226 U.S. 172, 33 S. Ct. 50, 57 L.Ed. 174 (1912); United States v. Wood, 226 F.2d 924 (4th Cir. 1955); United States v. 449 Cases Containing Tomato Paste, 212 F.2d 567, 45 A.L.R.2d 846 (2d Cir.1954); United States v. 5 Cases, More or Less, Containing "Figlia Mia Brand" etc., et al., 179 F.2d 519 (2d Cir.1950); C. C. Co. v. United States, 147 F.2d 820 (5th Cir.

1944); United States v. 935 Cases More or Less, Each Containing 6 No. 10 Cans Tomato Puree, 136 F.2d 523 (6th Cir. 1943). A drug shall be deemed to be misbranded when labeling is false or misleading in any particular. 21 U.S.C.A. § 352(a).

■ The Court was particularly impressed with the testimony of Dr. Baer and Dr. Kelter. There was nothing in the evidence, in the opinion of the Court, that either was motivated in the testimony given by any interest other than professional integrity. They differed in their ultimate conclusions. This is understandable when the approach is considered. Dr. Baer adhered to the strict line of scientific thinking that findings must be rejected in toto unless they are the product of the maximum objectivity that can be achieved according to recognized scientific methods of study and test. Dr. Kelter was critical of such rigid scientific technique, which he described as outmoded, taking the position that, when a physician treats a patient and observes results, such results cannot be ignored even though there is no rationale in scientific medical theory to account for them. The testimony of each of these doctors is entitled to considerable weight. On the one hand, Dr. Baer's testimony was very persuasive with respect to the weaknesses in the studies conducted by Dr. Shane and Dr. Kelter, particularly so, because of the nature of the disease of acne vulgaris. On the other hand, it is difficult, in the light of the testimony by Dr. Kelter, to conclude that his observations as to improvement of patients treated with Acnotabs are to be ignored entirely. But allowance must be made for the conceivable margin of error that would be inherent in the methods used to develop the factual information upon which the report of the effectiveness of Acnotabs was based. These studies, in the opinion of the Court, had value to the extent of indicating further and more objective clinical testing. In fact, Dr. Kelter testified that his tests are still continuing.

As a consequence, it does not seem to the Court that the results of these clinical studies can be translated into representations that Acnotabs will cure acne or would constitute an adequate effective treatment for the disease. The overall import of the leaflet literature is that the drug is the panacea for acne vulgaris and that quick and effective results, tantamount to cure, can be expected from use of one bottle, excepting in rare cases where probable recurrence of the disease would be in mild form. In conjunction with the printed matter in the label, the graphic matter on Exhibit G-2 showing a young man and a young lady with clear complexions holding a mask with dots resembling pimples suggests that the drug removes the mask of pimples leaving a clean, clear, healthy complexion. The impression is definitely created from the printed and graphic matter of the labeling that one who takes the drug, exclusive of other treatments, may expect that the problem of acne pimples will be eliminated, or at least substantially mitigated, within a relatively short period of time.

It may be that more objective and intensive clinical testing will demonstrate the effectiveness of the drug as a treatment for acne, or the lack of it, in a degree that cannot be determined by the evidence now before the Court. This is not to suggest that the burden of proof herein has been cast upon the Claimant. When Libelant came forth with competent expert medical testimony from which it could be inferred that the representations of Claimant as to the efficacy of its product were not well grounded, it became incumbent upon Claimant to demonstrate otherwise by its proofs. Claimant has not done this to the satisfaction of the Court.

■ When representations in the labeling of a product go beyond what has been established to be the fact, according to recognized standards in the particular field for the determination thereof, such representations must be considered as false and misleading.

Whether the misrepresentation springs directly from the literal import to the average reader of the statements made in the labeling or by calculated innuendo does not matter. Statements in the labeling of a product shipped in interstate commerce which are false and misleading in any sense of common understanding are prohibited. 21 U.S.C.A. § 352(a); United States v. 95 Barrels, etc., Vinegar, 265 U.S. 438, 44 S.Ct. 529, 68 L.Ed. 1094 (1924); V. E. Irons, Inc. v. United States, 244 F.2d 34 (1st Cir.1957), cert. den. 354 U.S. 923, 77 S.Ct. 1383, 1 L. Ed.2d 1437; Jeffries v. Olesen, 121 F. Supp. 463 (D.C.Cal.1954); United States v. 46 Cartons, etc., 113 F.Supp. 336 (D.C. N.J.1953). In the V. E. Irons case, supra, the Court, commenting upon the nature of representations which constitute mislabeling, stated:

"It must be remembered that a representation may be 'misleading' from the very fact of overemphasis and exaggeration, even though the product in question may be helpful, and in some circumstances useful, though not really indispensable to good health. * * *"

Having considered all of the evidence in the light of the applicable principles of law for evaluation of the probative value thereof together with the Stipulations of fact, the Court makes the following findings of fact:

1. "Acnotabs" is a drug (hereinafter referred to as "the drug") owned and shipped in interstate commerce by the Claimant, Pannett Products, Inc.

2. The drug is an internal medication consisting of Vitamin A, Vitamin C, pancreatin, bile salts, and pepsin prepared and recommended for use by Claimant in the treatment of acne vulgaris.

3. The drug is not injurious to health.

4. Clinical studies of the effect of the drug upon patients suffering from acne vulgaris, which were not extensive in scope or conducted with controls to assure maximum objectivity in evaluation of result, indicate that the drug does have some beneficial effects as a medication in the treatment of some cases of acne vulgaris.

5. The overall import of the labeling is that the drug has been thoroughly tested; that it is an adequate effective remedy for acne vulgaris tantamount to a cure; and that a person suffering from acne vulgaris may expect that the problem of acne pimples will be eliminated in a short period of time with recurrence only in rare cases and then in mild form.

6. The drug will not cure acne vulgaris.

7. The drug is not an adequate effective medication for acne vulgaris in the sense that the use of it will assure a blemish-free skin within a short period of time, with recurrence of the disease only in rare cases and then in mild form.

8. The effectiveness of the drug as a treatment for acne vulgaris has not been thoroughly tested.

Accordingly, the Court concludes that it has jurisdiction in the California case and in the New York case and finds that the drug, "Acnotabs," was misbranded and was shipped in interstate commerce and that Libelant is entitled to a decree of condemnation pursuant to the provisions of 21 U.S.C.A. § 334. Destruction of the drug does not follow condemnation as a matter of course. 21 U.S.C.A. § 334(d); A. O. Andersen & Co. v. United States, 284 F. 542 (9th Cir.1922). Thus, after entry of the decree and upon payment of the costs of the proceedings and the execution of bond as provided in 21 U.S.C.A. § 334(d), the Court may, upon application and pursuant to an appropriate Order, direct that the drug seized be delivered to the owner to be brought into compliance with the applicable provisions of Chapter 9 of Title 21.

Submit Decree and Order in accordance herewith.